528 P.2d 615

The STATE of Arizona, Appellee,

v.

David John FINN, Appellant.

No. 2911.

Supreme Court of Arizona,
In Banc.

Nov. 21, 1974.

Gary K. Nelson, Former Atty. Gen., N. Warner Lee, Atty. Gen., by Stanley L. Patchell, Asst. Atty. Gen., Phoenix, for appellee.

Welliever, Smith & McVay by J. Douglas McVay, Phoenix, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a judgment of guilt to the crime of armed robbery, §§ 13–641 and 13–643 A.R.S. Appellant Finn was sentenced to a term of from five to fifteen years in prison.

The issues presented by Finn on appeal are as follows:

1. Did the court commit error in admitting a statement of the defendant without (a) holding a voluntariness hearing; (b) making an express find-ing that the statement was voluntary; and·(c) instructing the jury as to its voluntariness?

2. Did the court err in admitting testimony of defendant's alleged refusal to answer questions?

3. Did the trial court err in admitting certain hearsay statements?

4. Did the trial court err in admitting a statement by a police witness that he knew the defendant?

The facts necessary for a determination of this case are as follows. On 25 January 1973 a young man at the YMCA was homosexually assaulted and robbed. The assailant emerged from a Y men's room and followed the victim into an enclosed stairwell. This assailant, armed with a knife, grabbed and pushed the victim against the staircase whereupon he undid the victim's pants, fondled his genitals, and then robbed his victim. The assailant compelled the victim to remove all clothing except for socks and lie face down on the floor. The victim later informed Mr. Whitham, the downstairs clerk at the Y, of the incident as well as the appearance of his assailant.

In the evening of 24 February 1973, another victim in this case was driving home when he stopped to use the restroom at Papago Park. Upon leaving the restroom, a person later identified by this victim as the defendant, David John Finn, approached the victim and asked him if he would "be interested in anything." When the victim responded with a "no" the defendant drew his gun and after being "frisked" the following transpired:

"A   After I was searched, I believe the buckle of my pants was loosened up so they could be dropped very easily at which time I believe they were to my ankles.

At· that time, my jacket then was taken off, and I had the shirt on, and I was told to put my hands over my head, and the shirt, the shirt simultaneously were pulled off; but not taken completely off,

rendering my sight useless. I couldn't see anything, and my hands were still up over my head.

"Q From that point on?

"A That's correct.

"Q Then, what happened after this?

"A I was told to lay on the ground face down. After I did so, spread eagle fashion, my shoes and socks were removed.

My pants and undershorts were removed.

"Q What happened after that?

"A At that time, I could hear him checking through my pockets and removing anything I had in there, and I was told at that time he was looking primarily for money.

Something else, not interested in credit cards or any other means of identification at all.

At that time, my ring was removed. I was told continually to keep quiet. Don't try anything.

At a short interval thereafter, after having been searched, I was threatened again repeatedly.

I had the gun, or I felt the gun. I did not see it. I felt the gun pointed in the back in the region of my spine.

At that time I was told, you know, what it feels like to have a bullet rip through your spine splintering your spine. You'll be crippled for the rest of your life.

At that time, I feared. I said, 'yes, I was frightened.' Again, I was told to lay perfectly still.

I was asked quite a few times if I had any other monies on me or in my automobile, and I answered 'no' each time.

I was probably, if I recall, probably whimpered a little bit, and I was hit in the head with the gun because I can recall I was hit four times.

I also had the gun placed in the entrance to the, my behind and was told you know what it feels like to have a bullet shot up your butt? Again, I was fearful for my life, and I was frightened.

Also, I had my legs spread a little further apart and a shoe placed on my testicles and was threatened as to my testicles if I blurted out in pain. At that time, I was then told to lay perfectly still, and if I did anything at all in any way, I would be shot; and I have to assume that at the time, as a warning to me—I wasn't—"

In the beginning of March the victim of the robbery at Papago Park, while driving in the same vicinity, spotted the defendant driving a car. He noted the license number and reported it to the police. The investigation by the police disclosed the car belonged to Finn's roommate and that Finn had access to it. The Phoenix police brought by some photos for the victim to look at and he selected a photo of Finn and a warrant was issued for Finn's arrest. The Phoenix police were unable to locate Finn.

On 17 March 1973 Finn was apprehended in Cranston, Rhode Island, by Officer Saccocia of Rhode Island, on the Arizona felony warrant. Finn was returned to Arizona to await trial.

Defendant was admitted to bail pending trial. At the trial, Finn did not take the stand in his own defense and the jury returned a verdict of guilty. From this verdict and judgment of guilty to the crime of armed robbery defendant appeals.

## STATEMENT TO THE POLICE BY THE DEFENDANT

Defendant was arrested in Cranston, Rhode Island, by Detective Sgt. Paul Saccocia of the Cranston Police Department. Sgt. Saccocia testified that at the time of the arrest he read to the defendant a standard Miranda rights card and:

"Q And did he understand his rights?

"A   He said he did.

"Q   And did you force him in any way to speak? Did you put any pressure on him to speak?

"A   No.

"Q   What did you ask him after you advised him of these rights?

"A   I asked him if he owned a gun."

At this point defendant's attorney objected:

"MR. VAN BAALEN: Your Honor, I object.

There is no foundation, not proper foundation at this time.

DIRECT EXAMINATION CONTINUED

"BY MR. SANDY:

"Q   Was anyone else there when you asked him this?

"A   There was another police officer there, and there was the fellow that owned the apartment, and a young woman in the apartment.

"Q   All right.

And what did he state after you asked him that question?

"MR. VAN BAALEN: Same objection, Your Honor.

"THE COURT: Overruled.

Overruled.

"MR. VAN BAALEN: I don't—for the record, I don't believe that counsel has established that the party understood these rights and knowingly waived these rights when he spoke.

I don't believe that that foundation is in the record at this time.

"THE COURT: Your objection is overruled."

The officer was allowed to answer.

The officer further testified that later the defendant was taken to the police station:

"A   We went back to the station, and he was advised of his constitutional rights again, and he signed a waiver to these rights.

In talking to him, he said 'yes, I do have a gun. It's in a camera case at the apartment.'

"Q   In a camera case at the apartment. And did you go back to the apartment?

"A   We went back to the apartment, and we retrieved the gun.

"Q   Was it where he said it was?

"A   Before we did go back, I asked him if I could have consent to search for his personal belongings and camera case, and he gave consent.

"Q   He did give consent for a search.

"A   We took down the camera case and personal belongings back to headquarters.

"Q   And in his personal belongings, or in the items you found, did you find the knife?

"A   Yes.

"Q   And did you also, did you find anything in his personal belongings that would indicate where he had recently gone?

"A   Yes, we found in his personal belongings, we found a bus ticket from San Francisco.

"Q   Did you have an occasion to talk to Mr. Finn about where he had been?

"A   Yes.

Of course, I've known David from before, and I had spoken to him—

"MR. VAN BAALEN: Your Honor, I object and move that statement be stricken.

It's completely irrelevant and improper. His previous knowledge of David.

"THE COURT: Well, he said he knew him from before. The answer may stand.

DIRECT EXAMINATION CONTINUED

"MR. SANDY:

"Q   Go ahead.

"A Knowing David, I spoke to him with reference to being in California because of the bus ticket, and also, because of the warrant from Arizona and being out in Arizona about a year or so ago, I questioned him about the climate and if he had been in Arizona.

He said he had been in Arizona. He had been in Frisco.

I asked him when, and with a smirk on his face, he said 'I wouldn't be crazy enough to tell you that.'

"Q He said 'I wouldn't be crazy enough to tell you that'?

"A Yes."

Defendant contends that these statements should not have been allowed absent (1) a hearing outside the jury, (2) an express finding by the court that the statements were voluntary, and (3) instructions to the jury concerning the voluntariness of the statements. We have stated:

" * * * We hold, in accord with Jackson, that in Arizona when a question is raised as to voluntariness of a statement constituting either admissions against interest, exculpatory or otherwise, or a confession, it must be resolved by the judge outside the presence of the jury. If he determines it was involuntary, it will not be admitted. If he determines it was voluntary, it may be admitted. Evidence tending to contradict the voluntary nature of the statement or confession may be admitted, and the jury may, as under the Massachusetts rule, then in effect disagree with the judge, and reject the confession." State v. Owen, 96 Ariz. 274, 277, 394 P.2d 206, 208 (1964).

In the instant case, while the defendant's counsel did make some objection as to foundation and whether there was a knowing waiver, he made no motion to suppress prior to trial nor did he ask for a hearing outside the presence of the jury when the questions were asked. Neither does the evidence raise a question of voluntariness as to defendant's statements.

The trial judge is not required, *sua sponte,* to enter into an examination outside the presence of the jury to determine possible involuntariness where the question of voluntariness is not raised either by the evidence or the defense counsel. We have stated:

"* * * In the present case no question of voluntariness was raised—either by defendant's attorney or by the evidence. Accordingly, we have concluded that the trial judge was not required, *sua sponte,* to enter upon an examination outside of the presence of the jury to determine the possible involuntariness of the confession." State v. Armstrong, 103 Ariz. 280, 281, 440 P.2d 307, 308 (1968).

Nevertheless, defendant further contends that even though no instruction on voluntariness was requested, the court should have *sua sponte* given an instruction to the jury on the voluntariness of the confession. We also answered this contention in State v. Armstrong when we stated:

"Since the decision in Jackson v. Denno, supra, other courts have held that, where there was no claim that an inculpatory statement was involuntary and the defendant denied making the statement, the trial court did not err in failing to, *sua sponte,* make a specific finding relative thereto, and that the failure to submit the question of voluntariness to the jury is not error. (citations omitted)." State v. Armstrong, supra at 282, 440 P.2d at 309.

Assuming that these statements were admission against interest, we find no error in their admission or their consideration by the jury without a specific finding of voluntariness or instruction concerning their voluntariness.

## REFUSAL TO ANSWER

Defendant further contends that the defendant's statement in response to the offi-

cer's question that "I wouldn't be ·crazy enough to tell you that," was in contravention of Finn's Fifth Amendment right to remain silent.

■ Testimony concerning defendant's silence in response to questions when defendant was in custody or under circumstances wherein it is defendant's constitutional right to remain silent is not admissible. State v. Simoneau, 98 Ariz. 2, 401 P. 2d 404 (1965); State v. Villalobos, 6 Ariz. App. 144, 430 P.2d 723 (1967). We have stated:

> "To hold that a defendant may, after being warned of his right to remain silent, have that silence used against him would nullify the warning required by Miranda, supra, and the warning would have to be amended to inform the defendant that not only what he says may be used against him, but what he doesn't say will also be used against him. * * *" State v. Shing, 109 Ariz. 361, 365, 509 P.2d 698, 702 (1973).

■ In the instant case we are faced with a different situation. Had the defendant refused to answer questions or stated "I · refuse to answer," that would have been clearly inadmissible. Simoneau, supra at 6. A defendant may, however, waive his right to remain silent and if he does, what he says may be used against him. The statement made by defendant herein falls on a middle ground. It is not clearly a refusal ·to answer, neither is it clearly a normal response to a question which indicates a willingness not only to answer but also a willingness that the questioning continue. Under the circumstances, we believe that there was no abuse of the trial court's discretion in admitting the answer. We are persuaded to this view by the fact that the defendant was clearly informed of his Miranda rights, there was no duress, he answered voluntarily, and also, though not persuasive, there was no objection to the question when it was asked at the trial.

We find no error in the admission of this statement.

## HEARSAY TESTIMONY

The defendant next contends that it was error to admit the statement by Mr. Whitham quoting the first victim's statement ("That's the man that robbed me") made three months after the crime.

■ The first victim was called by the State to testify concerning the time he was robbed by defendant at the YMCA. This testimony was admissible as to common scheme, plan or design. State v. Kelly, Ariz., 526 P.2d 720, 1974; State v. Phillips, 102 Ariz. 377, 430 P.2d 139 (1967); State v. Jacobs, 18 Ariz.App. 471, 503 P.2d 826 (1973).

The victim identified the defendant in the courtroom and also testified he recognized the defendant when he saw him at the YMCA several months after the robbery. The defense attempted, by cross examination, to impeach this identification of the defendant. The defense attempted to show that the victim did not have an adequate opportunity to see and identify his assailant at the time he was attacked since he was face down on the floor. The victim testified that the second time he saw . the defendant he was "pretty sure" it was the defendant. The victim testified:

"Q After this event, did there come a time in May, the first part of May of this year when you saw this man again?

"A Yes.

"Q Will you tell us the circumstances under which this happened?

"A I had just been working downstairs in the Physical Department at the time Mr. Whitham called me and just had me look at a person which turned out to be the fellow in the white shirt over there.

"Q The same person again?

"A Same person.

"Q When you saw him, you were sure it was him?

"A Pretty sure, right.

I was sure, right.

\* \* \* \* \* \*

CROSS-EXAMINATION

"BY MR. VAN BAALEN:

"Q Mr. ——, you said—one thing you said towards the end was you were pretty sure that Mr. Whitham, is it—

"A Right.

"Q —pointed this gentleman out to you and asked you if this was the same man that you had the problem with, and you said 'pretty sure.'

"A He did not point the man out.

He asked me to have a look and see if this was anybody I could identify.

"Q And you said you were pretty sure?

"A That's right."

To rebut defense's contention that the victim, at the time of the crime lacked time or ability to make an identification of his assailant, the State offered the testimony of Mr. Whitham who heard the victim several months after the crime occurred, identify David Finn as his assailant:

"Q After they came face to face passing, what did you see then?

"A At that point, Bob [the victim] turned around and came back to my desk.

"Q Would you describe his appearance when you saw them pass and Mr. —— saw this defendant face to face?

"A Well, I saw point of recognition.

"Q And how do you distinguish that point of recognition? What did you see that would indicate that?

"A Again, he was ashed in face.

"Q You mean like white in the face?

"A Yes.

Loss of blood in his face.

"Q All right.

And is that the same person that you saw in the YMCA in the first part of May, 1973, that is sitting in that chair right there?

(Indicating)

"A Yes.

"Q And then did Bob make a statement to you immediately thereafter?

I'm not asking you what that statement was, but did he say something?

"A Yes.

"Q All right.

At this point, I'll ask you what did he say?

"A MR. VAN BAALEN: Objection, Your Honor.

"MR. SANDY: It's not hearsay.

"THE COURT: Overruled.

"BY MR. SANDY:

"Q What did he say?

"A He said 'that's the man that attacked me earlier'.

"MR. SANDY: Okay.

That's all the questions I have."

Annotation in the American Law Report states:

"The rule now prevailing in most jurisdictions in which the question has been fully considered, subject to the qualifications and exceptions noted, is that the prior identification may be shown by the testimony of the identifier or identifying witnesses, or by the testimony of the third person to whom or in whose presence the identification was made, where the identifier has testified or is present and available for cross-examination at the trial, not as original, independent, or substantive proof "of the identity of the defendant as the guilty party, but in corroboration of the testimony of the identifying witness, at the trial, as to the identity of the defendant." 71 A.L.R.2d 453.

Justice Traynor of the California Supreme Court, however, has gone further and stated:

"Evidence of an extra-judicial identification is admissible, not only to corroborate an identification made at the trial (citations omitted), but as independent

evidence of identity. Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached (citations omitted), evidence of an extra-judicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. (citations omitted) The failure of the witness to repeat the extra-judicial identification in court does not destroy its probative value, for such failure may be explained by loss of memory or other circumstances. The extra-judicial identification tends to connect the defendant with the crime, and the principal danger of admitting hearsay evidence is not present since the witness is available at the trial for cross-examination. (citations omitted)" *People v. Gould*, 54 Cal.2d 621, 626, 7 Cal.Rptr. 273, 275, 354 P.2d 865, 867 (1960).

And this court has agreed with Traynor's interpretation. See *State v. Taylor*, 99 Ariz. 151, 407 P.2d 106 (1965); *State v. Miranda*, 98 Ariz. 11, 401 P.2d 716 (1965), reversed on other grounds.

■ In the instant case the witness had testified as to the identification, the defendant had attempted to impeach that testimony. The testimony of the desk clerk was admissible, if not to corroborate the testimony of the witness as is the rule in most cases, but as appears to be the case in Arizona, following the California rule, for its substantive evidence value as well. Evidence of the first victim's out. of court identification of the defendant was therefore admissible and it was not error to fail to exclude it.

## POLICEMAN'S REFERENCE TO KNOWING THE ACCUSED

During the trial Officer Saccocia of Rhode Island responded to a prosecutor's question:

"Q  Did you have occasion to talk to Mr. Finn about where he had been?

"A  Yes.

Of course, I've known David from before, and I had spoken to him—

"MR. VAN BAALEN (defense attorney): Your Honor, I object and move that statement be stricken. Its completely irrelevant and improper. His previous knowledge of David.

"THE COURT: Well, he said he knew him from before. The answer may stand.

\*     \*     \*     \*     \*     \*

"Q  Go ahead.

"A  Knowing David, I spoke to him with reference to being in California because of the bus ticket, and also, because of the warrant from Arizona and being out in Arizona about a year or so ago, I questioned him about the climate and if he had been in Arizona."

Defendant contends that the fact the officer testified that he had known David before "[was] a clear suggestion that the appellant had previous substantial involvement of a criminal nature of which Officer Saccocia was aware." The general rule in Arizona is:

"\* \* \* in the prosecution of one accused of a particular offense, evidence showing or tending to show the commission by accused of another crime entirely distinct and independent of that for which he is on trial, even though it be a crime of the same class, is neither relevant nor admissible." *State v. Dorsey*, 25 Ariz. 139, 143, 213 P. 1011, 1012 (1923). *State v. Moore*, 108 Ariz. 215, 495 P.2d 445 (1972).

■ We do not believe, however, that taken in the context of the trial before us, that the statements necessarily indicate that the defendant has a prior . record or has had previous trouble with the police. Policemen do know people other than criminals and given the size of the community in the instant case, it is just as reasonable

to assume that the officer's prior contact with the defendant was not as the result of any prior bad acts or criminal conduct on the part of the defendant himself. While we would have preferred that the officer had not made this statement, taken in the context of the entire trial, we find no prejudice.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.