762 P.2d 509

**STATE of Arizona, Appellee,**

v.

**John Arthur SMITH, Appellant.**

No. 6538.

Supreme Court of Arizona.

July 14, 1988.

Robert K. Corbin, Atty. Gen., Phoenix by William J. Schafer III, Galen E. Wilkes, Asst. Attys. Gen., for appellee.

George M. Sterling, Jr., Phoenix, for appellant.

SHELLEY, Judge.

On March 6, 1985, after a jury trial, defendant John Arthur Smith and his codefendant, Julie Lynn Cunningham, were each convicted of one count of armed robbery, A.R.S. § 13-1904. Defendant Cunningham's conviction and sentence were af-firmed by a memorandum decision of the court of appeals. *State v. Cunningham (Smith)*, 1 CA–CR 9006, memo. dec. filed Feb. 6, 1986.

Because Smith committed this crime while on probation, the trial court sentenced him to life imprisonment without possibility of parole for twenty-five years, A.R.S. § 13-604.01. Defendant appealed his conviction to this court. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13-4031, -4035.

On September 17, 1984, the Revco Drug Store in the Ahwatukee Plaza Shopping Center was robbed. Employees and customers inside the store told police that just before 9:00 p.m. a man and woman entered the store wearing nylon stockings over their faces. The couple were armed and ordered everyone to lie face down on the floor. The male robber then ordered the store pharmacist to fill a bag with drugs, including dangerous narcotics. He also took $1,827 in cash receipts from the store office before he and his accomplice fled from the store. Although store employees were able to give a general physical description of the male, they were not able to identify Smith as the robber.

Police obtained statements from witnesses inside the store and from those who were in the shopping center parking lot at the time of the robbery. While these statements differed on specific details, they were similar as to the general sequence of events. Witnesses told police that they observed a man and a woman sitting in a light-colored car in the parking area near the drug store. The couple got out of the car, put stockings over their faces, and entered the drugstore. The witnesses next saw the woman leave the drugstore, run towards the parked car, and drive away. A few minutes later, the man followed her out of the store but disappeared on foot behind a nearby Circle K. The woman in the car attempted to catch-up with him but eventually "peeled off" in the opposite direction.

One witness was able to obtain the license plate number of the automobile the woman was driving. With this informa-

tion, police obtained the name and address of Julie Lynn Cunningham. Smith and Cunningham were living together at this address, and both had access to the car. Police placed the house under surveillance and on October 2, 1984, executed a search warrant. Shortly thereafter, Smith was arrested and charged with armed robbery.

Following his conviction and sentence, Smith proceeded *in propria persona* until the time of this appeal. While acting in this capacity, Smith filed a motion to vacate judgment under Rule 24.2, Ariz.R.Crim.P., 17A A.R.S., alleging newly discovered evidence. *See* Rule 24.2(a)(2). The trial court summarily denied the motion.

Although Smith's pleading was framed as a motion to vacate judgment on the basis of newly-discovered evidence, we determined that the facts alleged in the motion presented a serious question as to whether Smith's right to effective assistance of counsel had been violated. In *State v. Smith*, 158 Ariz. 219, 762 P.2d 506 (1986), we remanded the case to the trial court for a full evidentiary hearing to determine whether counsel's representation was deficient under the surrounding circumstances, and if so, whether counsel's deficient performance prejudiced Smith. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222, *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985); *State v. Lee*, 142 Ariz. 210, 689 P.2d 153 (1984); *see also Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). It was the opinion of this court that to decide this appeal on the merits of either the ineffective assistance of counsel issue or the issues raised by Smith in his brief would be premature.

The trial court, after holding an evidentiary hearing on the issue of ineffectiveness of counsel, denied Smith's petition. We have consolidated review of this denial with the various evidentiary issues raised in defendant's original appeal.

## IDENTIFICATION

█ Smith posits that the identification of him as a perpetrator of the crime was so uncertain that as a matter of law, it could not support a criminal conviction. We disagree. At trial, the critical issue before the jury was identification. Although several witnesses from the parking lot testified to the robbers' general description, only three were able to make in-court identifications. The first witness, Larry Hilyard, positively identified Cunningham as the woman he had seen that night. Hilyard also pointed to Smith but was only "70 percent" sure of his identification. A second witness, Bernadina Rodriguez, similarly identified Cunningham as the robber. Rodriguez told the jury she was "about 50%" sure that Smith was the same man she had seen in the parking lot. On redirect examination, she stated:

Q. Do you believe that the person you saw at the Revco store is in the courtroom?

A. Yes, he is.

Finally, Judd Reung, a twelve-year-old witness, positively identified Cunningham, but testified that Smith looked different from the man he had seen both before and after the robbery.

Other testimony at trial concerned the existence of physical evidence. Corporal Maggard of the Maricopa County Sheriff's Office testified that fingerprint and shoeprint evidence had been taken from inside the store and from an area behind the Circle K where the robber disappeared. An evidence technician with the Maricopa County Sheriff's Office testified that, while she had compared these prints to those of Smith, she could not make a positive match. She also testified that the ground where the tracks were found was such that some portions of it were of a type that would not leave visible footprints. Partial footprints were also seen in the area.

Detective Jackson showed Hilyard a photo lineup containing Smith's photo a week after the robbery. Hilyard immediately picked out appellant's picture. He said he was 80% sure about his lineup identification.

Reung testified that Cunningham was the girl he saw on the night of the robbery, stating: "I am pretty sure it is her." The

store employees' general description of the male robber was similar to Smith's size and build. Additionally we note that Smith and Cunningham were living together, and both had access to the use of the vehicle.

We are required to take the evidence in the light most favorable to sustaining the trial court's verdict. *State v. Long,* 121 Ariz. 280, 589 P.2d 1312 (1979). We review the record to determine whether there was sufficient evidence for a rational trier of fact to have found a defendant guilty beyond a reasonable doubt. *State v. Goswick,* 142 Ariz. 582, 691 P.2d 673 (1984). In *State v. Dutton,* 83 Ariz. 193, 198, 318 P.2d 667, 669–70 (1957), the court stated:

> There is somewhat of a dearth of authority in this jurisdiction on the law governing identification; however, by independent search we find that in the case of *La Grange v. State,* 26 Ariz. 102, 222 P. 414, 415 [1924] (there the question involved was identification of a dead body), this court quoted with approval the following:
>
> > '*On questions of identity, it is not necessary that a witness should swear positively and pointedly; it is only necessary and is of common occurrence, for them to swear that they believe the person to be the same, and the degree of credit to be attached to their evidence, is a question for the jury.*' *State v. Dickson,* 78 Mo. 438; *Greenwell v. Crow,* 73 Mo. 638; 1 Greenleaf Ev. 440; 3 Greenleaf Ev. 133.
>
> Turning to reported cases from other jurisdictions it appears to be well settled that identification of a defendant, necessary to support a conviction, need only comply with the requirement of proof beyond a reasonable doubt. Uncertainty of identifying evidence goes to its weight, rather than its admissibility. (Emphasis added)

*See also, State v. Norgard,* 103 Ariz. 381, 442 P.2d 544 (1968).

Sufficient evidence was presented upon which the jury could find Smith guilty of the armed robbery.

## INSINUATION OF OTHER CRIMINAL ACTS

 Smith posits that the state insinuated in its examination of Detectives Jackson and Maxwell, with respect to the preparation of the photo lineups, that Smith was guilty of other criminal acts. Smith did not object to any of the questions propounded to Detectives Jackson and Maxwell with respect to the preparation of the photo lineups, nor did he make a request for a mistrial.

The defendant must make a timely objection at trial in order to give the trial court an opportunity to correct any error. Smith is therefore precluded from pursuing this issue as error on appeal. *State v. Miller,* 112 Ariz. 95, 98, 537 P.2d 965, 968 (1975); *State v. Coward,* 108 Ariz. 270, 271, 496 P.2d 131, 132 (1972). Even if the issue was not precluded, Smith's assertion is incorrect. He based his assertion on the prosecutor's questioning of Detectives Jackson and Maxwell. Detective Jackson testified:

[Q] When you prepared the photo lineups for Mr. Smith's lineup and for Ms. Cunningham's lineup, had you personally ever seen either Smith or Cunningham?

A. No, sir, I hadn't.

Q. Was there any way for you to compare how accurate the likeness of Mr. Smith was, that is the accurate—gosh, excuse me, Your Honor.

Was there any way for you to compare the accuracy of how well the photograph you included in Mr. Smith's lineup was in relation to any personal knowledge you had about what he looked like?

A. No, sir, there wasn't.

. . . .

Q. BY MR. LAMAR: What caused you to show the photograph—the photographic lineup of Mr. Smith and Miss Cunningham?

A. Another meeting at the Phoenix Police Department with the various agencies and—where we got together and we were all talking about the evidence, or the leads, or whatever we had in these cases.

Q. Without being specific about the leads, was it based on that meeting that you showed the lineups?

A. Yes, it was.

. . . .

Q. All right. And I believe you testified Thursday that when you included the photographs you had of defendants Smith and Cunningham in those photo lineups, you had never personally seen either defendant; is that correct?

A. That's correct.

Detective Maxwell testified:

Q. By the way, did you understand, when you set up your surveillance on the Morton address, that the subject, whose name was Julie Cunningham, and a subject whose name was John Arthur Smith, in fact, resided in that house?

A. Yes, sir, I did.

Q. And how did you come to learn that?

A. Through a Detective Rose who is a robbery detective for the Phoenix Police Department.

Q. Did you make checks on a previous address of these two subjects?

A. Yes, sir, I did.

The questioning did not imply prior criminal acts by either Smith or Cunningham. Police officers know people through sources other than a police investigation. *State v. Finn*, 111 Ariz. 271, 278, 528 P.2d 615, 622 (1974). The fact that Jackson had never seen Smith or Cunningham when he prepared the photo lineups implies nothing. Also, the fact that the lineups were shown after the various agencies of the police department got together and discussed the evidence and the leads in the case could logically be referable to the case against Smith and Cunningham and does not necessarily imply other criminal activities. It is logical that a robbery detective for the Phoenix Police Department would be involved in the investigation of a robbery and as a result thereof, would discover that Julie Cunningham and Smith resided together at the Morton address.

Jackson stated that after discussing the case with the other officers, they were able to put together a photo lineup. This does not suggest prior crimes. In this connec-

tion, the jury was informed that the police found out very soon after the robbery that the car bearing the license number given to them by witness Rodriguez belonged to Julie Cunningham's father. He told them that his daughter and Smith were living together and that she had the use of his car. Thus the jury could well have inferred that the source of the photos was Julie Cunningham's father.

In *State v. Bruni*, 129 Ariz. 312, 320, 630 P.2d 1044, 1052 (App.1981), the court stated:

Appellant's last argument has no merit. The lead detective in the case testified that during the investigation she obtained a photo of appellant for the purpose of assembling a photographic lineup to show to the victims. There was no reference to appellant's prior police record, the witness did not use the term "mug shot", and the statement does not imply any prior criminal record. Although the introduction into evidence of mug shots or the mention of the fact that the police had photos of the defendant taken sometime before the crime can be error when it infers a prior arrest, *State v. Kelly*, 111 Ariz. 181, 526 P.2d 720 (1974), *cert. den.* 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975), that is not the situation here. *It is just as reasonable that the jury would infer that such photo was available from some source other than police records as, for example, a driver's license. See State v. Dixon, 127 Ariz. 554, 622 P.2d 501 (App. 1980).* (Emphasis added.)

## JURY INSTRUCTIONS

 Smith posits that the trial court erred in failing to give an instruction based on *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), to the effect that if the jury found that the state destroyed any evidence, the contents or quality of which were in issue, the jury might infer that the evidence would have favored Smith's case. The basis for the requested instruction was that the piece of paper on which Bernadina Rodriquez had written the license number

of the car which fled the shopping center was lost.

To be entitled to a *Willits* instruction, a defendant must prove that (1) the state failed to preserve material and reasonably accessible evidence that could have had a tendency to exonerate the accused, and (2) there was resulting prejudice. *State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984). The trial court's decision to forego a *Willits* instruction for failure to satisfy either or both of the above requirements is not reversible error absent an abuse of discretion. *State v. Reffitt*, 145 Ariz. 452, 461, 702 P.2d 681, 690 (1985). A *Willits* instruction must be predicated on a theory supported by the evidence, or else it should not be given, because such would tend to mislead the jury. *State v. Axley*, 132 Ariz. 383, 393, 646 P.2d 268, 278 (1982).

There is only one conceivable way in which the paper with the license number on it might tend to exonerate Smith and his co-defendant. If the number on the paper was not the license number of Smith's and Cunningham's car, it could be inferred that the police made a mistake, that is, they mistakenly transposed a number or numbers and were relying on that mistaken number in tracking down Cunningham and Smith. If that were the case and the number written on the paper correctly recorded the license plate of the robbers, then the real robbers have never been apprehended.

There are, however, several things that lead to the conclusion that the trial judge did not abuse his discretion in denying a *Willits* instruction. There is nothing except speculation to suggest that the number on the paper was not Smith's license number. The defense did not, in cross-examining Bernadina Rodriquez, attempt to develop testimony to suggest that she had written down the wrong number or that the police had made a mistake in broadcasting and tracing the number. The number was broadcast to the Maricopa County Sheriff's dispatcher in the presence of Bernadina Rodriquez, who had seen the car and who had written the number down. She did not correct the policeman, and the dispatcher recorded the number on the dispatch log. There was a double check available to the defense on the accuracy of the number the witness wrote down. The number derived from the paper was independently incorporated into a different written police report prepared by Detective Jackson. That report was never admitted in evidence, but it was presumably available. A comparison of it with the number on the dispatcher's report would have either corroborated or damaged the presumption that the number the police traced was the one the witness originally wrote down. This coincidental double recordation occurred before any question arose as to what was written on the paper and at a time when the police would have had every motive to be accurate and no motive to destroy evidence. Under all the circumstances of this case, a *Willits* instruction was not required. *See State v. Axley*, 132 Ariz. at 393, 646 P.2d at 278.

## INEFFECTIVE ASSISTANCE OF COUNSEL

• Smith posits that he was denied effective assistance of counsel because counsel did not present an alibi defense and he did not present evidence concerning Smith's back injury.

### ALIBI

At the evidentiary hearing, Smith's trial counsel testified that prior to trial, Smith gave him the name of Nancy Garden as a possible alibi witness. He told his attorney that she had been with him on the night of the robbery but that she could only account for his time up to 8 p.m. The robbery occurred at 9 p.m. in Awahtukee, *a 20–minute drive* from the Blue Door Bar where she last saw Smith. Counsel testified that an alibi witness should not be presented unless it was air-tight or Smith had nothing else to work with. He felt that he had a good defense of mistaken identity because witnesses were not positive in their identification of the male robber. He discussed the possibility of using Garden as an alibi witness with co-counsel and with Smith. Counsel testified as follows:

And, so, finally, I went back to John, I remember very clearly in the jail, and I, in essence, told him the thought process that I had gone through, and I told him how I felt about alibi defenses and how this lady really wasn't an alibi defense anyhow, and I said I will pursue this if you want me to because it's your life, not mine, but this is the way I feel and this is what I think, and we have a lot to work with here in terms of reasonable doubt. And, so, he, in essence, said, all right, you are the lawyer. If that's the way you feel about it, we will go with the way you think the case should be defended.

Smith's counsel decided not to interview Garden. Additionally, his counsel felt that an alibi defense would be particularly weak since Smith was not going to testify at the trial. Nancy Garden testified at the evidentiary hearing that she met Smith at 9 p.m. at the Blue Door Bar and that she based the time on the fact that the band was playing and it was dark. She told the trial court that bands in bars usually start to play at around 9 p.m., therefore it must have been 9 p.m. when she met Smith. On cross-examination she admitted that she had only been at the Blue Door Bar two or three times and did not know when the band started playing. She did not know what time she arrived at the Blue Door Bar on the night in question, other than that it was dark and the band was playing.

Smith testified at the evidentiary hearing. He could not recall when he left the Blue Door Bar on the night of the robbery. He could not recall what time he told his counsel during the pretrial interview that he was with Garden at the Blue Door on the night of the robbery. The trial court found:

6. Mr. James Kemper, who represented the defendant at trial, interviewed the defendant and was told by him that he was with witness Nancy Garden until 8:00 p.m. on the date of the robbery at the Blue Door Bar, which was approximately one hour prior to the robbery.

7. Mr. Kemper discussed the calling of this witness with the defendant, who told Mr. Kemper to make the decision whether to call her. Mr. Kemper did not interview or call this witness based upon his tactical judgment that the witness could not provide an alibi for 9:00 p.m. and would, if presented, make the defense look contrived and undermine the inherent weaknesses in the State's identification evidence.

In order to prove ineffective assistance of counsel, a two-pronged test must be met. First, Smith must show that counsel's performance was deficient. Second, he must show that counsel's deficient performance prejudiced his defense. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985). *See also, Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

■ Assuming *arguendo*, that counsel's failure to interview Garden constituted deficient performance, Smith failed to show that the deficient performance prejudiced his defense. Garden's testimony that she met Smith at 9 p.m. was based upon her assumption as to when the band would have started to play and the fact that it was dark, which on September 17th would mean very little in respect to a 9 p.m. robbery.

Additionally, Smith testified that he did not know when he left Garden's company on the night in question. There was no showing of a reasonable possibility that Garden's testimony would have changed the results. Smith's defense was not prejudiced.

Smith asserts that in the case of *State v. Tapia*, 151 Ariz. 62, 725 P.2d 1096 (1986), this court determined that trial counsel's failure to interview the two people who could testify to Tapia's whereabouts immediately before and after commission of the crime constituted ineffective assistance of counsel, even though evidence from the alibi witnesses had a 4 to 5 hour gap. He asserts that in light of *Tapia*, we are required to reverse this case. We disagree. We quote from *Tapia* as follows:

In post trial hearings the testimony which could have been given was presented through Priscilla Mendibles, the defendant's girlfriend, and her father, Manuel Mendibles. The testimony

corroborates much of what the defendant testified to in the trial. The testimony shows that the defendant had taken Priscilla to the hospital where she bore his son. This is supported by hospital records showing that defendant was present at the admission. The defendant was happy with the birth of his son, and he stayed with Priscilla at the hospital for several hours. He left the hospital in the late afternoon. Priscilla next saw him at the hospital in the early morning hours of June 19th.

Manuel Mendibles testified at trial as a State's witness, but his full testimony was not developed by the defense. Mendibles' testimony would have corroborated much of what the defendant stated at trial. Mendibles was with the defendant at a party on June 18 from 8:00 p.m. to 10:00 p.m. The defendant was tired by 10:00 p.m., and Mendibles asked the defendant to go home to the Mendibles' house. When Mendibles arrived home in the early morning hours of June 19, he saw what he took to be the defendant in one of the beds.

The defense now contends that the additional evidence supports the defendant's position that he was happy about the birth of his son without any motive or desire to commit a brutal murder and that his activities during the crucial hours of the crime are accounted for by other witnesses.

*Tapia*, 151 Ariz. at 64, 725 P.2d at 1098. Defendant Tapia was charged with murder. There was no physical evidence linking him with the murder. Fingerprints found on the pruning shears used by the murderer did not match his prints. Two key prosecution witnesses linking defendant to the crime admitted on the stand that they lied to the police about the case. Defendant testified in his own behalf but no evidence was produced to corroborate any part of his alibi testimony. His testimony covered his whereabouts during the 4-5 hour gap. Since he had recanted his confession, his credibility was questionable. This court held that failure to interview and call the witnesses needed to bolster his alibi prejudiced his case.

The *Tapia* case is inapposite to the facts of this case. Smith does not contend that he would have testified if the alibi evidence had been presented. He merely asserts that Nancy Garden should have been interviewed and called as a witness. In this case, no evidence was needed to corroborate Smith's alibi testimony because he did not testify and his credibility was, therefore, not in issue.

The trial court did not abuse its discretion in finding that counsel was effective as to the alibi.

## BACK INJURY

Smith contends that he was denied effective assistance of counsel because counsel failed (1) to interview Smith's treating doctor, his therapist, and Nancy Garden, all of whom could testify about Smith's lack of mobility, and (2) to present evidence to the jury on the nature and extent of Smith's back injury.

Smith fell from a roof on September 12, 1984 while working as a roofer. He was diagnosed by the doctor as having a low back sprain. Smith was given Parafon Forte, Tylenol and Tolectin, and was started on a course of physical therapy.

Trial testimony indicates that the male robber jumped over a counter and some display racks before running from the Revco Drug Store and disappearing on foot. The record does not indicate how high the racks were; however, pictures in evidence showed the racks to be about the height of a normal checkout counter.

At Smith's evidentiary hearing on his claim of ineffective assistance of counsel, he testified that he never told his counsel it would have been impossible for him to jump over a counter and racks at the store. Smith testified that he told counsel he was "pretty much immobile" at the time; however, Smith also testified that he was not certain what he told his counsel. Smith's counsel testified Smith told him only that his back was injured and that he wore a corset occasionally. Counsel said he was

also aware Smith had received medical treatment from a doctor and a therapist.

■ The main issue during trial was Smith's identification. Smith alleges that if the jury had known of his back injury, the verdict would have been different because his physical limitations were "totally inconsistent with prosecution's witnesses' testimony that 'the male robber was jumping' over racks and counters and that he 'ran' from the Revco." Smith alleges his counsel's failure to interview witnesses who could testify about his injury and to mention his injury to the jury constituted ineffective assistance of counsel and reversible error.

1. *Did counsel's failure to interview Smith's doctor and therapist as well as Smith's friend, Nancy Garden, result in ineffective assistance of counsel?*

Smith alleges his doctor and therapist would have supported his claim that, because of his injury, he could not have been the male robber. The doctor and therapist did not testify at the evidentiary hearing, but their reports were admitted in evidence. The doctor's September 24, 1984 report stated that Smith had severe pain in the back and going down into his right buttock and right leg. The report further stated, however: *"No sensory or motor defect is noted in the lower extremities."* (Emphasis added.) Thus, there is no indication that Smith did not have full use of his legs or that he couldn't jump over the counter as the male robber had done.

Smith asserts Nancy Garden's testimony might have helped his case. She testified at the evidentiary hearing that she met Smith at a bar, saw him carefully sit down, and saw him limp, moving slowly, deliberately and carefully. Such testimony does not prove that he could not run and jump in an excited situation such as a robbery.

2. *Would discussion at trial of Smith's back injury have aided the prosecution by supporting witness's identification of a limping robber and by providing a motive for the robbery?*

One witness told defense counsel before trial that the male robber limped as he ran from the drug store. During the evidentiary hearing, the prosecutor testified that he knew that a witness had stated that the male robber was limping as he left the drug store. The prosecutor also testified that he thought the limping might be due to something Smith did while running, and if he had known about the bad back, he would have pursued that line of evidence both in his investigation and at trial. A store employee testified at trial that the male robber stated: "Hey, man, I have got a bad back." Testimony about Smith's bad back, coupled with trial testimony that he was limping during the robbery, would have strengthened the prosecution's identification of Smith as the male robber. Also, since Smith had three prescriptions for pain medication, he could have been using them the night of the robbery and been able to jump over the counter and some racks, especially since he had no motor deficiency in his legs.

Smith's counsel was also aware that 9 of the 10 drugs obtained by Smith during the robbery were narcotic pain-killers; that Smith told a drugstore employee that he only wanted class 2 and 3 drugs; that Smith repeatedly asked the pharmacist for "the good stuff"; and that Smith asked for Tussionex (which contains codeine) by name. The pharmacist testified that Tussionex is popular with drug abusers. Counsel also knew the prosecution wanted to introduce evidence that the robber stole 2,830 tablets and capsules of narcotic pain-killing drugs, 600 tablets of Valium and $1,827 in cash. These facts, coupled with evidence of Smith's back injury, would further implicate him in the robbery.

Pursuant to a search warrant issued October 2, 1984, the police found approximately 100 tablets containing narcotics, a syringe with 90 c.c. Oxycodone, a known narcotic drug, other empty syringes, and 13 capsules of a dangerous drug.

Also on October 2, Julie Cunningham, the co-defendant, was arrested and searched. Police found in her purse eight Tylenol # 3 pills with codeine, two capsules of Phenaphen with Codeine # 4, eight capsules of Dalmane 15, five tablets of Tylenol

#4 with Codeine, 73 Valium tablets, six Secobarbital tablets (a dangerous drug), marijuana and other drug paraphernalia. After she was released on her own recognizance, Cunningham visited Smith at the jail and was caught passing two balloons containing Diazepain, a combination of Valium and Codeine. Many of the items found in the search and in the balloons were similar to the items taken from Revco during the robbery.

Smith's counsel successfully moved to keep the evidence obtained during the two searches together with the two balloons containing Diazepain from being introduced at trial. Counsel testified at the evidentiary hearing that he felt that mentioning Smith's back injury during trial could lead to the introduction of the previously barred evidence and incriminate Smith under Rule 404(b), Arizona Rules of Evidence, which reads:

> (b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as *proof of motive,* opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

At the evidentiary hearing, the trial court found:

> 8. Mr. Kemper was aware of the defendant's physical condition and its trial potential. This defense was not pursued or presented for the following tactical reasons:
>
> A. The robber's predominant motive was to obtain painkilling drugs from the pharmacy which was robbed and, therefore, would be consistent with the defendant's painful back condition;
>
> B. At least one of the potential witnesses interviewed by the prosecutor and Mr. Kemper indicated that the male robber limped during his escape and, therefore, would be consistent with the defendant's back injury; and

> C. If the defendant's condition and treatment with drugs were introduced into the case, evidence of similar illicit drugs found at the defendant's residence and evidence that co-defendant Cunningham attempted to smuggle similar painkillers to the defendant in the county jail might have been rendered admissible at the trial.
>
> 9. The above described actions and inactions by Mr. Kemper were prompted by tactical judgments which this Court finds to be reasonable under the facts and circumstances of this case.

Based upon the foregoing, this Court concludes, as a matter of law, that Mr. Kemper's representation of the defendant at trial was not deficient and did demonstrate at least minimal competence under the circumstances and in light of prevailing professional norms.

Further, this court concludes, that the course of action suggested by the defendant through counsel does not present a reasonable probability that the defendant would have been acquitted at trial if such course were undertaken.

Counsel's decision not to use evidence of Smith's back injury was a reasonable tactical decision. "Actions which appear to be a choice of trial tactics will not support an allegation of ineffective assistance of counsel." *State v. Espinosa–Gamez,* 139 Ariz. 415, 421, 678 P.2d 1379, 1386 (1984).

In *State v. Adamson,* 136 Ariz. 250, 265, 665 P.2d 972, 987 (1983) we stated:

> At the outset we note that a petition for post-conviction relief is addressed to the discretion of the trial court. The granting or denying of such a petition is discretionary with the trial court and will not be reversed by this court unless it affirmatively appears that there has been an abuse of discretion.

We find that the trial court did not abuse its discretion in finding that defendant received effective assistance of counsel.

The judgment of the trial is affirmed.

FELDMAN, V.C.J., and CAMERON, HOLOHAN and MOELLER, JJ., concur.

GORDON, C.J., did not participate in this decision; and pursuant to Ariz. Const. art. 6, § 3, Melvyn T. Shelley, Judge, Court of Appeals, Division One, was designated to sit in his stead.