NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

LEE PENNELL SHINE, JR., *Appellant*.

No. 1 CA-CR 15-0453
FILED 7-12-2016

Appeal from the Superior Court in Maricopa County
No.  CR2012-005450-002
The Honorable Danielle J. Viola, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Michael J. Dew Attorney at Law, Phoenix
By Michael J. Dew
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Lawrence F. Winthrop and Judge Randall M. Howe joined.

---

J O H N S E N, Judge:

¶1          Lee Pennell Shine, Jr., appeals his convictions and sentences on one count of conspiracy to commit first-degree murder and one count of first-degree murder.  Counsel for Shine filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), advising that after searching the record on appeal, he was unable to find any arguable ground for reversal.  Shine was granted the opportunity to file a supplemental brief *in propria persona*, but he has not done so.  After reviewing the entire record, we affirm Shine's convictions and sentences.

¶2          We have jurisdiction of Shine's timely appeal pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes sections 12-120.21(A)(1) (2016), 13-4031 (2016) and -4033 (2016).[1]

¶3          Our obligation is to review the entire record for reversible error.  *State v. Clark*, 196 Ariz. 530, 537, ¶ 30 (App. 1999).  We view the facts in the light most favorable to sustaining the convictions and resolve all reasonable inferences against Shine.  *State v. Guerra*, 161 Ariz. 289, 293 (1989).  The following evidence was presented at trial.

¶4          On the evening of October 22, 2011, two police officers on patrol received a call regarding a suspicious vehicle.  The officers responded and found a gunshot victim in the driver's seat, the engine running.  The man eventually died from the gunshot wound.

¶5          After obtaining a search warrant for the vehicle, officers seized the victim's cellular phone.  The phone's call and message history revealed numerous contacts from a single number during the hours preceding the homicide.  A detective traced the phone number to Joe Jasso's mother.  During an interview, Jasso inculpated himself, Queinten McDowell, William McIntyre and Shine in a conspiracy to murder the

---

[1]          Absent material revision after the date of an alleged offense, we cite a statute's current version.

victim. Interviewed later, McDowell likewise stated that he and Jasso conspired with McIntyre and Shine to murder the victim.

¶6 McIntyre shared an apartment with Shine in October 2011. At the time, neither was employed and they spent much time playing video games and using drugs, primarily marijuana. About three weeks before the murder, McIntyre met Jasso and McDowell outside his apartment complex, where they approached him and asked for help obtaining marijuana. During the ensuing conversation, McIntyre invited Jasso and McDowell to return with him to the apartment. Jasso and McDowell then began living at the apartment, with the four men spending their days playing video games and doing drugs.

¶7 Before long, the men ran low on money and drugs, and Shine offered to sell his laptop to acquire both. Jasso volunteered that he knew someone who would be willing to buy it, and contacted the victim. Jasso and McDowell then met with the victim and traded Shine's laptop for marijuana. At some point later, Shine expressed displeasure that Jasso and McDowell had not received more marijuana in the exchange, believing he had been shorted in the transaction. To "get back" at the victim, Shine suggested they rob him. He also expressed a desire to fight the victim.

¶8 Initially, McIntyre viewed Shine's threats to harm the victim as a joke, but the tone of the conversations became serious as the men discussed different scenarios for robbing the victim. Eventually the conversations adopted an even darker tone, when Shine suggested he could kill the victim by stabbing him with a knife. Jasso rebuffed Shine's idea, concluding it was unworkable because the victim knew only Jasso and McDowell and would never allow Shine within stabbing distance. Instead, Jasso and McDowell decided they would attack the victim.

¶9 The day before the murder, Shine left the apartment to visit his grandparents. McIntyre then provided Jasso and McDowell with a gun and Jasso contacted the victim and arranged a meeting under the pretense of purchasing marijuana. McIntyre waited at the apartment while Jasso and McDowell met the victim.

¶10 When Jasso and McDowell returned to the apartment, Jasso was covered in blood. Jasso and McDowell "excited[ly]" told McIntyre that they had met with the victim in his car and that McDowell had stepped out of the vehicle, then shot the victim through the open driver's side window. Jasso quickly grabbed all of the money and drugs he could find before jumping out of the car. After recounting the murder, McDowell returned

the gun to McIntyre, but asked to keep the expended shell casing as a "trophy."

¶11        During the following two days, the men consumed most of the stolen drugs.  When Shine returned to the apartment two days after the shooting, the men informed him that they had killed the victim and Shine responded "All right. Where is my money?"  Shine was high when he returned and seemed indifferent.  About a week later, McIntyre moved out of the apartment and Shine and McIntyre no longer associated with each other or with Jasso and McDowell.

¶12        After the other men implicated Shine, officers brought him in for questioning.  At the outset, the detective advised Shine of his *Miranda* rights and Shine confirmed he understood them.  *See Miranda v. Arizona*, 384 U.S. 436 (1966).  Shine then told the detective that he had been visiting his grandparents the weekend of the homicide and "didn't do anything."  In response to questioning, Shine acknowledged that he had made some statements about harming the victim, but claimed he was high at the time and had not been "serious."  He also admitted that, before he left for the weekend, the other men made plans to kill the victim, but he claimed he "honestly thought" they would not go through with it and would just "get the weed" and return to the apartment.  When directly asked whether he knew the men would kill the victim, however, Shine answered "yes."  Indeed, Shine stated that the other men offered to get his money and kill the victim for him.  When the detective asked Shine whether he accepted their offer, Shine responded, "Yes, I did."

¶13        After Shine's arrest, authorities recovered a letter that had been intercepted from his cellmate.  Shine had requested that the letter be delivered to McIntyre.  In the letter, Shine informed McIntyre: "[W]e need to have the same story just you and me . . . if the cops find out . . . were [sic] f*****.  We need a story that we need to stick to."[2]  The letter then offered a story for McIntyre to tell the police and also suggested a possible alibi.

¶14        After a 24-day trial, a jury found Shine guilty of first-degree murder and conspiracy to commit first-degree murder.  The court sentenced Shine to concurrent terms of life imprisonment with the

---

[2]        Pursuant to the superior court's ruling, portions of the letter referring to McDowell, Shine's codefendant at trial, were redacted.  The other co-conspirators entered guilty pleas.

possibility of parole after 25 years on both counts, with 1,263 days' presentence incarceration credit. This timely appeal followed.

**¶15** We have searched the entire record for reversible error and have found none. All of the proceedings were conducted in accordance with the Arizona Rules of Criminal Procedure. The record shows Shine was present for all critical pretrial and trial proceedings; his counsel waived his presence for a handful of non-critical events. Shine was represented by counsel in all pretrial proceedings and throughout the trial.

**¶16** The superior court did not conduct a voluntariness hearing; however, neither Shine nor the evidence raised a question about the voluntariness of Shine's statements. *See State v. Smith*, 114 Ariz. 415, 419 (1977); *State v. Finn*, 111 Ariz. 271, 275 (1974). Given the possible sentences to be imposed on the crimes with which Shine was charged, the court properly empaneled 16 jurors. The court properly instructed the jury on the elements of the charges, mere presence, the presumption of innocence, reasonable doubt, the State's burden of proof and the necessity of a unanimous verdict. The State presented both direct and circumstantial evidence sufficient to allow the jury to convict.

**¶17** Shine had an opportunity to speak before sentencing. The court received and considered a presentence report, addressed its contents during the sentencing hearing and imposed legal sentences for the crimes of which Shine was convicted. Accordingly, we affirm Shine's convictions and sentences.

**¶18** Upon the filing of this decision, counsel shall inform Shine of the status of the appeal and his options. Defense counsel has no further obligations unless, upon review, counsel finds an issue appropriate for

submission to the Arizona Supreme Court by petition for review. *See State v. Shattuck*, 140 Ariz. 582, 584-85 (1984). Shine shall have 30 days from the date of this decision to proceed, if he so desires, with a *pro per* motion for reconsideration or a petition for review.



Ruth A. Willingham · Clerk of the Court
F I L E D : AA