IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee*,

*v.*

MICHAEL JONATHON CARLSON,
*Appellant.*

No. CR-12-0464-AP
Filed June 18, 2015

Appeal from the Superior Court in Pima County
The Honorable Richard D. Nichols, Judge
No. CR20093544-001
**AFFIRMED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, Julie A. Done (argued), Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Lori J. Lefferts, Pima County Public Defender, Rebecca A. McLean and David J. Euchner (argued), Assistant Public Defenders, Tucson, Attorneys for Michael Jonathon Carlson

JUSTICE BERCH authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL and TIMMER joined.

JUSTICE BERCH, opinion of the Court:

¶1　　　Michael Jonathon Carlson was convicted of two counts of kidnapping and two counts of first-degree murder. This automatic appeal

follows the imposition of the death penalty. Ariz. R. Crim. P. 31.2(b). We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13–4031.

## I. FACTUAL AND PROCEDURAL HISTORY

¶2        In the spring of 2009, Michael Carlson moved into a recreational vehicle on a rural property in Pima County.[1] Larry owned the property and lived there with his family, including his son, daughter-in-law, and grandchildren. Also living together in a trailer on the property were KR and Becky.

¶3        Carlson felt close to Larry and thought that KR and Becky "annoyed" Larry and his family by using methamphetamines, shooting a gun on the property, and stealing. Believing KR or Becky had stolen a ruby cross from Larry's trailer, Carlson decided to make KR and Becky "disappear." While holding a gun on KR, he ordered Becky to tie KR up. Carlson then tied Becky up and ordered the victims into the trunk of his car. After driving for a while, he noticed that Becky had become untied and worked her way from the trunk partially into the back seat. Carlson shot her and then KR to keep them from escaping. He took the bodies back to the property where he burned them in a pit until they were reduced to ash and small bone fragments.

¶4        Within a few days, Carlson told Larry that he had murdered KR and Becky. Nearly a month later, Larry called police and told them that Carlson was staying in a trailer on his property and had an outstanding arrest warrant from Texas. Police officers immediately came and arrested Carlson.

¶5        Ten days later, Carlson called a local television station and asked to speak to a reporter. When the reporter visited Carlson in the Pima County Jail, Carlson confessed to murdering KR and Becky, as well as eight other people. For trial, the parties stipulated that, despite the detail in

---

[1]        "We view the facts in the light most favorable to upholding the verdicts." *State v. Chappell*, 225 Ariz. 229, 233 ¶ 2 n.1, 236 P.3d 1176, 1180 n.1 (2010).

Carlson's confession, the authorities in the other jurisdictions in which Carlson admitted committing murders could not find evidence that those murders had actually occurred.

¶6         The jury found Carlson guilty of two counts of felony murder and two counts of kidnapping.  The jury then found three aggravating circumstances:  Carlson had been convicted of a prior serious offense, A.R.S. § 13–751(F)(2); he committed the murders while on release from custody, *id.* § 13–751(F)(7); and he committed multiple murders during the commission of the offense, *id.* § 13–751(F)(8).  In the penalty phase, the jury determined that Carlson should be sentenced to death for each murder.  The court sentenced Carlson to consecutive twenty-one-year sentences for the two kidnappings.

## II.  DISCUSSION

### A.     *Corpus Delicti* **for Kidnapping**

¶7         Carlson argues that the trial court erred by admitting his television interview as evidence of the two kidnapping counts because the State never established the *corpus delicti* for those crimes.  He argues that without his incriminating statements, the State could not establish the kidnappings.  "We review a ruling on the sufficiency of the evidence of *corpus delicti* for abuse of discretion."  *State v. Morris*, 215 Ariz. 324, 333 ¶ 33, 160 P.3d 203, 212 (2007).  We will "affirm the trial court's ruling if the result was legally correct for any reason."  *State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984).

¶8         To introduce a defendant's confession, the state must present corroborating evidence from which jurors could reasonably infer that the crime charged actually occurred.  *See State v. Hall*, 204 Ariz. 442, 453 ¶ 43, 65 P.3d 90, 101 (2003).  The standard for the corroborating evidence is not high.  "Only a reasonable inference of the *corpus delicti* need exist before a confession may be considered," and circumstantial evidence suffices to support the inference.  *Id.* (quoting *State v. Gillies*, 135 Ariz. 500, 506, 662 P.2d 1007, 1013 (1983)).  Nor need the showing be made before the defendant's statements are presented, "[a]s long as the State ultimately submits adequate proof of the *corpus delicti* before it rests."  *Id.* (quoting *State*

*v. Jones ex rel. Cnty. of Maricopa*, 198 Ariz. 18, 23 ¶ 14, 6 P.3d 323, 328 (App. 2000)). The rule is designed to prevent convictions based solely on uncorroborated statements. *State v. Chappell*, 225 Ariz. 229, 234 ¶ 9, 236 P.3d 1176, 1181 (2010).

**¶9** A different corroboration rule, the "trustworthiness doctrine," has become the standard in most federal courts and has been adopted by several state courts. *E.g.*, *United States v. Shunk*, 881 F.2d 917, 919–21 (10th Cir. 1989); *see also State v. Parker*, 337 S.E.2d 487, 492 (N.C. 1985) (observing that "federal courts and an increasing number of states" follow the trustworthiness approach). That doctrine requires the government "to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement." *Opper v. United States*, 348 U.S. 84, 93 (1954). As with the traditional approach, the burden is not heavy. "It is sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth." *Id.*

**¶10** Although this Court has never adopted the trustworthiness doctrine, our court of appeals addressed it in *State v. Morgan*, 204 Ariz. 166, 171–72 ¶¶ 17–21, 61 P.3d 460, 465–66 (App. 2002). The trial court in this case relied on *Morgan* when it admitted Carlson's incriminating statements, and in their briefs in this court, the parties have cited *Morgan* as though it adopted the trustworthiness rule.[2]

**¶11** But *Morgan* addressed trustworthiness in connection with its analysis of the closely related crimes exception to the *corpus delicti* rule. There, a defendant charged with several sexual offenses confessed to each charge. *Id.* at 169 ¶¶ 6–7, 61 P.3d at 463. Evidence established the *corpus delicti* for all counts except a charge that the defendant had engaged in oral sexual contact with a minor. *Id.* at 172–73 ¶ 23, 61 P.3d at 466–67. After the court evaluated both the *corpus delicti* and trustworthiness corroboration rules, it held that the state had established the *corpus delicti* for all charges.

---

[2] Several unpublished court of appeals cases have cited *Morgan* for the proposition that Arizona has adopted the trustworthiness test. But *Morgan* did not purport to do so, and this Court has never done so. Absent argument from the parties that we should modify or dispense with our *corpus delicti* rule, we will continue to apply our current rule.

*Id.* It reasoned that, when a defendant confesses to several related crimes, independent evidence that establishes the commission of the closely related crimes may suffice to corroborate the confession as a whole, rendering it admissible. *Id.*

**¶12** *Morgan*'s analysis comports with this Court's current rule, which requires only sufficient corroborating evidence "to warrant a reasonable inference that the crime charged was actually committed." *State v. Hernandez*, 83 Ariz. 279, 282, 320 P.2d 467, 469 (1958); *see also Hall*, 204 Ariz. at 453 ¶ 43, 65 P.3d at 101; *Chappell*, 225 Ariz. at 234 ¶ 9, 236 P.3d at 1181; *Gillies*, 135 Ariz. at 506, 662 P.2d at 1013. We agree with *Morgan*'s reasoning that, under our *corpus delicti* rule, independent evidence that establishes the commission of one crime may help corroborate the commission of other, closely related crimes. *See* 204 Ariz. at 172–73 ¶ 23, 61 P.3d at 466–67.

**¶13** Here, blood and DNA evidence linked to Becky was found in the back seat and trunk of Carlson's car. Becky's purse was found in her trailer, and testimony indicated that she would have taken it with her had she left the property voluntarily. This evidence supports an inference that Carlson kidnapped Becky.

**¶14** The defense did not separately object to the *corpus delicti* finding as to KR alone, and the evidence of KR's kidnapping is less clear than that relating to Becky's kidnapping. Nonetheless, the evidence was sufficient to establish the *corpus delicti*. KR's DNA was found in the passenger compartment of Carlson's car. Although none was found in the trunk, Carlson had cleaned the trunk and disposed of the bloody floor mat from it. Moreover, KR and Becky lived together and disappeared at the same time. Their remains were disposed of at the same place and in the same manner. This evidence indicates that Becky and KR met with similar fates and that the kidnappings and murders were closely related in time and circumstance so that the corroboration of Becky's kidnapping and KR's murder tends to indicate that KR was also kidnapped. *See id.* Although, as the defense points out, this evidence could also indicate that KR and Becky were murdered before being placed in the car, "the prosecution need not eliminate all inferences tending to show a noncriminal cause [for the existence of the evidence]." *People v. Ochoa*, 966 P.2d 442, 474 (Cal. 1998), *as*

*modified* (Cal. 1999) (quoting *People v. Jacobson*, 405 P.2d 555, 561 (Cal. 1965)). The trial court therefore did not abuse its discretion in determining that the State presented sufficient evidence of the *corpus delicti* for kidnapping.

¶15　　　　Finally, Carlson argues that his confession should have been excluded because it was inherently untrustworthy given that it included confessions to eight other uncorroborated murders. As discussed above, this Court has not adopted the trustworthiness doctrine, and Carlson does not expressly advocate that we should do so now. But under either the *corpus delicti* or trustworthiness corroboration rule, "as long as this very modest corroboration requirement is satisfied, the ultimate truth or falsity of the defendant's confession is a determination left to the jury." *State v. Housler*, 193 S.W.3d 476, 491 (Tenn. 2006) (evaluating a defendant's confession that included a significant amount of false information). Carlson's confession was consistent with the evidence relating to the kidnapping and murders of KR and Becky. The defense was free to—and did—argue to the jury lack of trustworthiness stemming from Carlson's confessions to other crimes.

¶16　　　　Under our *corpus delicti* rule, the State met its burden for both kidnapping charges. The trial court therefore did not abuse its discretion in admitting Carlson's incriminating statements to the television reporter.

## B.　　Accomplice Liability

¶17　　　　After the jury found Carlson guilty of two counts of kidnapping and two counts of felony murder, the court gave an *Enmund/Tison* instruction, which asked the jury to evaluate Carlson's participation in the kidnappings. *See Tison v. Arizona*, 481 U.S. 137 (1987); *Enmund v. Florida*, 458 U.S. 782 (1982). To be eligible for the death penalty, a defendant must have actually killed, intended that a killing take place, or been a major participant in the underlying felony and recklessly indifferent to another person's life—a question that typically arises when the defendant was one of two or more participants in the crime.[3] *See State v.*

---

[3]　　In this case, the prosecutor suggested providing *Enmund/Tison* instructions and verdict forms. Defense counsel agreed that the court should submit the *Enmund/Tison* forms to the jury, and the trial judge

*Payne*, 233 Ariz. 484, 517 ¶¶ 145, 147 & n.6, 314 P.3d 1239, 1272 & n.6 (2013). The jurors unanimously found Carlson eligible for the death penalty: eight found that he actually killed the victims and four concluded that he either intended that a killing take place or was a major participant in the crimes.

**¶18** Carlson asserts that the four jurors' determination that he was a major participant in the crimes means that they found that he was merely an accomplice to crimes committed by another. From that premise, he argues that (1) these four jurors based their verdicts on inappropriate assumptions, speculation, and conjecture; (2) if the evidence supported verdicts based on accomplice liability, then the court committed fundamental error by failing to give appropriate accomplice jury instructions; and (3) the felony-murder verdicts were for non-existent crimes because Arizona law does not support a felony-murder conviction when the defendant was only an accomplice to the predicate felony. Because Carlson's premise is flawed, however, we do not reach his derivative arguments.

**¶19** The jurors' *Enmund/Tison* findings do not necessarily indicate that they believed someone else committed the murders. To convict Carlson of felony murder, the jurors had to conclude only that the victims' deaths were "cause[d]" in furtherance of the kidnappings. *See* A.R.S. § 13–1105(A)(2). They did not need to conclude that Carlson "actually killed" KR and Becky. Thus, the four jurors could have believed that Becky and KR died by accident during the commission of the kidnappings. In other words, the jurors could have concluded that Carlson did not "actually kill" KR and Becky, but that he nonetheless was responsible for causing their deaths.

**¶20** More likely, having found Carlson guilty of felony murder and kidnapping—and having been presented no evidence that he acted with an accomplice and no accomplice instruction having been given—the jurors were simply confused when presented with the "degree of participation" instructions and verdict forms. *Cf. Payne*, 233 Ariz. at 517

---

complied. Although this was likely well-intentioned, we caution that giving *Enmund/Tison* forms in a case that involves only one perpetrator is unnecessary and potentially confusing to the jurors.

¶ 147 & n.6, 314 P.3d at 1272 & n.6 (noting that *Enmund/Tison* findings are appropriate when the defendant's participation level is in question, such as when an accomplice is involved). Whatever else the jury's *Enmund/Tison* findings mean, they confirm the jury's belief that Carlson was sufficiently culpable to qualify for the death penalty.

**¶21** Absent any evidence that Carlson acted with an accomplice, the trial court did not commit fundamental error by failing to give an accomplice instruction. *See State v. Ross*, 107 Ariz. 240, 242–43, 485 P.2d 810, 812–13 (1971). Because the jury's *Enmund/Tison* verdicts do not undermine the convictions, Carlson's premise fails and it is unnecessary for the Court to address his related arguments.

### C.    Dr. Haney's Expert Testimony

**¶22** During trial, Carlson sought to have Dr. Craig Haney testify about the brutality in the Texas prison system when Carlson was incarcerated there and also regarding "personality and behavior characteristics" and "risk factors" that might explain why Carlson might have falsely confessed to the television reporter. Defense counsel also sought to have Dr. Haney testify that Carlson told him that he (Carlson) had falsely confessed. The court allowed Dr. Haney to testify regarding the Texas prison system, but precluded testimony that Carlson told Dr. Haney that he had falsely confessed and Dr. Haney's explanation for why Carlson might have done so.

**¶23** Carlson argues that precluding the latter categories of Dr. Haney's testimony violated Carlson's constitutional right to present a complete defense under the Due Process Clause and also violated the Compulsory Process and Confrontation Clauses.[4] We review a trial court's preclusion of expert testimony for an abuse of discretion. *See State v. Salazar-Mercado*, 234 Ariz. 590, 594 ¶ 13, 325 P.3d 996, 1000 (2014). Absent

---

[4]    Carlson does not cite any authority or make any arguments regarding the Compulsory Process or Confrontation Clauses. We therefore do not address them. *See In re Aubuchon*, 233 Ariz. 62, 64–65 ¶ 6, 309 P.3d 886, 888–89 (2013) ("[W]e consider waived those arguments not supported by adequate explanation, citations to the record, or authority.").

an objection, we review for fundamental error. *See State v. Cañez*, 202 Ariz. 133, 147 ¶ 30, 42 P.3d 564, 578 (2002).

**¶24** Preliminarily, we note that a trial court should not preclude an expert's testimony without allowing the defense to make an offer of proof. Defense counsel here filed a trial memorandum describing Dr. Haney's proposed testimony. When the court indicated that it would not allow testimony on the two categories, defense counsel asked to supplement its offer of proof, but the trial court denied the request. Although Carlson does not challenge this denial on appeal and the record suffices to allow us to determine whether reversible error occurred, a supplemented offer would have aided our evaluation of the trial court's decision. We remind trial judges to allow counsel to make offers of proof, especially when the court precludes testimony that the defense asserts is essential to the defense in a capital case. *See* Ariz. R. Evid. 103.

**¶25** The Arizona Rules of Evidence provide a framework for identifying admissible expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Ariz. R. Evid. 702. The trial judge must act as a gatekeeper by applying this rule to admit "only relevant and reliable expert testimony." *Salazar-Mercado*, 234 Ariz. at 593 ¶ 9, 325 P.3d at 999.

**¶26** Dr. Haney purportedly relied on Carlson's statement that he confessed falsely and also on his explanation for why he did so as the foundation for the doctor's opinion that Carlson was susceptible to falsely confessing. The trial court, however, excluded those statements as inadmissible hearsay. *See* Ariz. R. Evid. 801, 802. The rules of evidence

provide that an expert "may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Ariz. R. Evid. 703. Those facts or data "need not be admissible" so long as "experts in the particular field would reasonably rely on those kinds of facts or data." *Id.* But "Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6273 (Victor James Gold ed. 2015); *cf. State v. Lundstrom*, 161 Ariz. 141, 148, 776 P.2d 1067, 1074 (1989) (expert testimony that merely parrots or summarizes another's opinion is inadmissible). That is the case here respecting Dr. Haney's attempt to offer Carlson's statement that he confessed falsely. Dr. Haney would not have provided any additional insight or information regarding that disclosure, and Carlson could not have made the statement in testifying without submitting to cross-examination.

**¶27** When an expert bases an opinion on facts or data that are not otherwise admissible, there is "a presumption against disclosure to the jury," Fed. R. Evid. 703 advisory committee's note to 2000 amends., and even when such facts or data are admissible, they may be introduced only "for the limited purpose" of showing the basis of the expert's opinion, Ariz. R. Evid. 703 cmt. to original 1977 r.; *State v. Tucker*, 215 Ariz. 298, 314 ¶ 52, 160 P.3d 177, 193 (2007). For two reasons, we conclude that the trial court did not abuse its discretion.

**¶28** First, Carlson never established whether reasonable experts in the field of false confessions would, as part of their analyses, rely on the defendant's own statement that he falsely confessed and that certain factors caused him to do so. Other courts have held that an expert should not be able to submit inadmissible hearsay from a biased witness as a basis for an opinion. *See Sikes v. Seaboard Coast Line R.R. Co.*, 429 So. 2d 1216, 1223 (Fla. Dist. Ct. App. 1983) (citing *Dallas & Mavis Forwarding Co. v. Stegall*, 659 F.2d 721 (6th Cir. 1981)). "The trial process is better served when a biased . . . declarant is required to testify directly and to be subject to cross-examination." *Dallas & Mavis Forwarding Co.*, 659 F.2d at 722. Here, Carlson's statements were inadmissible, biased hearsay, and he failed to show that a reasonable expert would rely on them in forming an opinion.

**¶29** Second, the trial court did not abuse its discretion in determining that allowing Dr. Haney to testify that Carlson said he falsely confessed would have put Carlson's statements before the jury cloaked with the implication that Dr. Haney believed those statements and relied on them, while shielding Carlson from the rigors of cross-examination. *See id.* (allowing a defendant's statement "to be heard through the testimony of an [expert] would cloak it with undeserved authority that could unduly sway a jury"); *see also State v. Lindsey*, 149 Ariz. 472, 474–75, 720 P.2d 73, 75–76 (1986). A defendant may not convey self-serving statements regarding the truth of his own confession through an expert's testimony. Nor may he have an expert opine on whether the defendant was telling the truth when asserting that his confession was false. *See State v. Hyde*, 186 Ariz. 252, 276, 921 P.2d 655, 679 (1996) ("An expert may not give an opinion as to the accuracy, reliability, or truthfulness of a [party]."); *see also United States v. Ganadonegro*, 805 F. Supp. 2d 1188, 1212 (D.N.M. 2011) (concluding, after collecting cases, that "[t]he Court would not, as apparently any court would not, allow the expert to say a particular defendant gave a false confession. . . . [T]his line prevents the expert from invading the province of the jury . . . .").

**¶30** Carlson next argues that the trial court abused its discretion in preventing Dr. Haney from testifying about risk factors that would tend to make Carlson more likely to confess falsely. The court barred this testimony because Dr. Haney had not tested or examined Carlson to determine whether he exhibited the risk factors and did not base his potential testimony on any studies of his own or by others examining why a person would falsely confess in a voluntary news interview. His experience was in the police interrogation context.

**¶31** The State did not challenge Dr. Haney's expertise in addressing why defendants may succumb to pressure to confess in police interrogations. But defense counsel admitted that Dr. Haney had no experience or publications dealing with voluntary confessions to the media. Nonetheless, given Dr. Haney's general expertise regarding false confessions, his "lack of specialization" should have gone "to the weight of the evidence rather than its admissibility[,] and '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on

the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)); *accord State v. Villalobos*, 225 Ariz. 74, 81 ¶ 27, 235 P.3d 227, 234 (2010) ("The medical examiner's specialization in pathology did not disqualify him from giving expert testimony on pain.  Instead, the physician's certification went only to the weight of his testimony." (citations omitted)).  Nonetheless, the trial court did not abuse its discretion in excluding the testimony because Dr. Haney's testimony went to Carlson's general propensity to lie rather than to the mental or physical circumstances affecting the voluntariness of this confession.  *See Perez*, 141 Ariz. at 464, 687 P.2d at 1219 ("We are obliged to affirm the trial court's ruling if the result was legally correct for any reason.").

**¶32**        Although this Court has dealt with expert testimony relating to the voluntariness of confessions, *see State v. Blakley*, 204 Ariz. 429, 437–38 ¶¶ 33–38, 65 P.3d 77, 85–86 (2003) (evaluating whether the trial court "prevented [the expert] from rendering a final opinion as to whether the confession was voluntary"); *Hyde*, 186 Ariz. at 275–76, 921 P.2d at 678–79 (evaluating expert testimony regarding the "defendant's mental condition when he made his statements to the Phoenix police"), we have yet to directly address the admissibility of expert testimony regarding a defendant's propensity to lie.  We are guided, however, by several federal court decisions that have addressed the issue.  *See* Ariz. R. Evid. prefatory cmt. to 2012 amends. ("Where the language of an Arizona rule parallels that of a federal rule, federal court decisions interpreting the federal rule are persuasive but not binding with respect to interpreting the Arizona rule."); *see also United States v. Benally*, 541 F.3d 990, 995 (10th Cir. 2008); *United States v. Adams*, 271 F.3d 1236, 1244–45 (10th Cir. 2001); *United States v. Hall*, 93 F.3d 1337, 1341–45 (7th Cir. 1996); *United States v. Shay*, 57 F.3d 126, 130–33 (1st Cir. 1995).

**¶33**        Federal circuit courts that have allowed expert testimony regarding a defendant's propensity to lie have required that the testimony relate to some mental or personality disorder that would cause the defendant to lie.  *See Hall*, 93 F.3d at 1344–45; *Shay*, 57 F.3d at 133–34. Carlson never suggested that his false confession was caused by any mental disorder, personality disorder, or a similar affliction, and because Dr.

Haney did not diagnose or treat Carlson, Dr. Haney had no personal knowledge regarding whether Carlson had such disorders or conditions.

¶34 Carlson argues that the facts here are "more egregious" than those in *Shay* or *Hall* because personality disorders are "at least understood on some level." But those cases did not turn solely on the distinction between mental disorders and other reasons to lie. The court in *Shay* distinguished between testimony based on the expert's training and scientific knowledge about a specific disorder or condition and expert testimony that relies primarily on a defendant's own perception and reporting to form a basis for the expert's opinion about a defendant's general propensity to lie. *See Shay*, 57 F.3d at 133 (observing that the expert had evaluated and diagnosed the defendant before testifying to that diagnosis and how it might affect the defendant's propensity to lie); *see also Hall*, 93 F.3d at 1341, 1345 (noting that a psychiatrist who examined the defendant and the defendant's medical records should have been allowed to testify regarding whether the defendant's mental condition affected his propensity to lie).

¶35 Unlike blind expert profile testimony, which is generally admissible because "expert testimony about general behavior patterns . . . may help the jury understand the evidence," *Salazar-Mercado*, 234 Ariz. at 594 ¶ 15, 325 P.3d at 1000, Dr. Haney's testimony would have gone "'beyond the description of general principles of social or behavioral science' to offer opinions about 'the accuracy, reliability or credibility of a particular [party] in the case being tried.'" *Id.* (quoting *Lindsey*, 149 Ariz. at 474–75, 720 P.2d at 75–76). By offering testimony regarding Carlson's background and risk factors, Dr. Haney, who was not Carlson's treating physician, would have expanded well beyond general principles to seemingly vouch for the information that Carlson had provided to him. *See Hall*, 93 F.3d at 1344 (expert testimony that relies "solely on . . . acceptance of the victim's account . . . amounted to nothing more than an invitation to the jury to believe [the expert's] assessment of the victim's truthfulness"). Any such testimony would have intruded upon the jury's role, and thus the trial court did not abuse its discretion when it excluded Dr. Haney's testimony regarding Carlson's general propensity to lie.

¶36 Carlson next argues that, if Dr. Haney's testimony was

inadmissible under the rules of evidence, "such mechanistic application of the rules of evidence would constitute a violation of Carlson's constitutional right to present a defense." But "[a] breach of the . . . Rules of Evidence does not, in itself, offend the Constitution." *United States v. Hernandez-Guevara*, 162 F.3d 863, 876 n.3 (5th Cir. 1998). Such an argument "confuses a fundamental right, the right to present a theory of defense, with one that is not fundamental, the right to present that theory in whatever manner and with whatever evidence [the defendant] chooses." *Adams*, 271 F.3d at 1243.

¶37    While "[t]he 'blanket exclusion' of evidence regarding the circumstances of a confession precludes a fair trial," *id.* at 1245 (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), "evidence related to the credibility of a confession may be excluded" through proper application of the rules of evidence. *Id.* Carlson does not explain how the trial court applied the rules of evidence in a "mechanistic" way. We therefore conclude that the court's exclusion of Dr. Haney's testimony did not violate Carlson's right to present a defense or to a fair trial.

### D.    *Willits* Instruction

¶38    Carlson argues that the trial court abused its discretion by refusing to give a *Willits* instruction allowing the jury to draw an adverse inference from the State's failure to acquire and preserve Larry's cell phone and failing to obtain cell phone records "for every cell phone on the property belonging to . . . the residents." *See State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964). Carlson asserts that this failure also deprived him of his due process rights. Because Carlson objected at trial, "[w]e review [the] rulings regarding a *Willits* instruction for abuse of discretion." *State v. Glissendorf*, 235 Ariz. 147, 150 ¶ 7, 329 P.3d 1049, 1052 (2014). Because Carlson did not object on due process grounds, however, we review only for fundamental error whether denying the *Willits* instruction deprived Carlson of due process. *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶39    *Willits* "require[s] trial judges to instruct [jurors] that if they find that the state has lost, destroyed[,] or failed to preserve material evidence that *might* aid the defendant and they find the explanation for the

loss inadequate, they may draw an inference that that evidence would have been unfavorable to the state." *State v. Youngblood*, 173 Ariz. 502, 506, 844 P.2d 1152, 1156 (1993). A defendant is entitled to a *Willits* instruction if "the state failed to preserve material and reasonably accessible evidence that could have had a tendency to exonerate the accused." *Glissendorf*, 235 Ariz. at 150 ¶ 8, 329 P.3d at 1052 (quoting *State v. Smith*, 158 Ariz. 222, 227, 762 P.2d 509, 514 (1988)). Evidence having a "tendency to exonerate" favors the defendant or is "potentially useful to a defense theory," but need not have "the potential to completely absolve the defendant." *Id.* at 150 ¶¶ 9–10, 329 P.3d at 1052. The defendant "must do more than simply speculate about how the evidence might have been helpful." *Id.*

**¶40** The record does not show whether Larry's cell phone was ever found, making it unclear whether it was reasonably accessible. The phone *records* were reasonably available via subpoena, but Carlson does not specify exactly what data—text histories, call histories, or the contents of text messages—those records would have contained. Even if we assume, however, that the State could have secured the potentially relevant phone and phone record data, Carlson still has not established that this evidence was likely helpful to his defense.

**¶41** Carlson speculates that Larry's missing phone and phone records would have been beneficial to him, but does not demonstrate why this is so. *See Smith*, 158 Ariz. at 227, 762 P.2d at 514 (*Willits* instruction not appropriate when defendant merely speculates that a lost piece of paper would have contained information implicating someone else in the crime); *see also Perez*, 141 Ariz. at 464, 687 P.2d at 1219 (no *Willits* instruction required where a lost videotape may have either inculpated or exonerated the defendant). Carlson therefore has not established that the lost evidence tended to exculpate him.

**¶42** Carlson further argues that the denial of his request for a *Willits* instruction violated his due process rights. To prove a violation of due process, Carlson must establish that the State acted in bad faith when it failed to acquire or preserve the evidence in question. *Glissendorf*, 235 Ariz. at 150–51 ¶ 11, 329 P.3d at 1052–53. Because Carlson did not offer any evidence that the State acted in bad faith when it failed to preserve the cell phone or phone records, the trial court did not fundamentally err or violate

his due process rights by denying the requested *Willits* instruction.

### E.    Inapplicability of the (F)(2) Aggravator

¶43        Carlson argues that using the kidnappings that were the predicate felonies for his felony-murder convictions to also aggravate his sentence under A.R.S. § 13–751(F)(2) fails to narrow the class of offenders eligible for the death penalty, thereby violating the Eighth Amendment and the Arizona Constitution's prohibition on cruel and unusual punishment. U.S. Const. amend VIII; Ariz. Const. art. 2, § 15.

¶44        Section 13–751(F)(2) allows jurors to consider whether a defendant has committed prior serious offenses in determining whether to impose a death sentence:

> [The jury may consider whether t]he defendant has been or was previously convicted of a serious offense, whether preparatory or completed. *Convictions for serious offenses committed on the same occasion as the homicide*, or not committed on the same occasion but consolidated for trial with the homicide, *shall be treated as a serious offense under this paragraph.*

*Id.* (emphasis added).    The last sentence of this statute—which plainly contemplates that the "serious offense" may include offenses that were committed at the same time as the homicide—was added by the legislature in 2003 in response to court rulings that had held otherwise.  *See* 2003 Ariz. Sess. Laws, ch. 255, § 1 (1st Reg. Sess.); *see also State v. Nordstrom*, 230 Ariz. 110, 118 ¶ 35, 280 P.3d 1244, 1252 (2012) ("[T]he legislature amended the (F)(2) aggravator in 2003 to explicitly include contemporaneous convictions . . . [and] evidently was intended to displace our ruling in *State v. Rutledge*, 206 Ariz. 172, 175–78 ¶¶ 15–25 & n.3, 76 P.3d 443, 446–49 & n.3 (2003).").

¶45        In *State v. Forde*, this Court rejected the argument Carlson now makes—that the (F)(2) aggravator, when based on crimes that occurred in connection with the murders in question, fails to narrow the class of defendants eligible for the death penalty.  233 Ariz. 543, 569 ¶¶ 105–08, 315 P.3d 1200, 1226 (2014).  We held there that the (F)(2) aggravator as amended does not violate the Eighth Amendment because § 13–751(J) sufficiently

defines "serious offense" so that it "appropriately channels and limits the sentencer's discretion." *Id.* at 569 ¶ 107, 315 P.3d at 1226. We rejected Forde's reliance on *Rutledge*, a case that dealt with the pre-2003 version of the statute. *Id.* at 569 ¶ 108, 315 P.3d at 1226.

¶46 Carlson acknowledges the holding in *Forde*, but argues that while *Forde* mentioned *Rutledge*, it did not discuss several other cases that address this issue. But, like *Rutledge*, the other cases Carlson cites discuss only the pre-2003 version of A.R.S. § 13–751(F)(2). *See State v. Pandeli*, 204 Ariz. 569, 571 ¶¶ 5–7, 65 P.3d 950, 952 (2003) (interpreting 2001 version of statute); *State v. Phillips*, 202 Ariz. 427, 438–39 ¶¶ 56–57, 46 P.3d 1048, 1059–60 (2002); *State v. (Robert G.) Jones*, 197 Ariz. 290, 311 ¶ 64, 4 P.3d 345, 366 (2000); *State v. Gretzler*, 135 Ariz. 42, 57 n.2, 659 P.2d 1, 16 n.2 (1983); *State v. Ortiz*, 131 Ariz. 195, 210–11, 639 P.2d 1020, 1035–36 (1981). Thus, despite language in *Ortiz*, *Gretzler*, and *Phillips* suggesting that "serious offenses" should not include contemporaneous crimes, these cases did not interpret the 2003 amendment and none of these cases rests on a finding of unconstitutionality.

¶47 Carlson offers two more arguments for why the amended (F)(2) aggravator fails to narrow the class of offenders eligible for the death penalty. First, he argues that the list of "serious offenses" under § 13–751(I)[5] is "significant[ly] align[ed]" with the enumerated predicate offenses for felony murder under § 13–1105(A)(2), making nearly every defendant convicted of felony murder eligible for the death penalty.

¶48 We disagree. Comparing the two statutes reveals that several predicate offenses for felony murder—including marijuana offenses, dangerous drug offenses, certain other narcotics offenses, drive-by shootings, escape, and unlawful flight from a pursuing law enforcement vehicle—are not "serious offenses" that would allow a jury to find the (F)(2) aggravator. *Compare* A.R.S. § 13–1105(A)(2) (enumerating offenses that may be predicates for felony murder), *with* A.R.S. § 13–751(J) (enumerating offenses that qualify as "serious" for purposes of § 13–751). Thus, not every conviction for felony murder renders the defendant death-eligible under

---

[5] Section 13–751(I) is now § 13–751(J). *See* 2012 Ariz. Sess. Laws, ch. 207, § 2 (2d Reg. Sess.).

the (F)(2) aggravator and so the statute still permits some discrimination among those eligible for the death penalty.

**¶49** Second, Carlson argues that "[e]xpanding the death penalty to include almost all felony murders" contravenes the legislature's "implied belief" that felony murder is the only class of first-degree murder "worthy of hope for release from incarceration." Rather than imputing such an unexpressed belief to the legislature, however, we instead rely on the legislature's explicit amendment in 2003 to include contemporaneous "serious offenses" under the (F)(2) aggravator. By that amendment, the legislature clearly expressed its intent to permit use of predicate crimes as (F)(2) aggravating circumstances. Thus the use of Carlson's kidnapping convictions as both aggravating factors and predicate felonies for felony murder does not violate the federal or Arizona constitutions.

**¶50** Carlson also argues that his Texas conviction for aggravated robbery does not qualify as an aggravating circumstance because aggravated robbery in Texas "may be committed in a manner that does not qualify as a 'serious offense' under A.R.S. § 13–751(I)." Because Carlson's kidnapping convictions suffice to prove the (F)(2) aggravator, we do not address this issue.

### F. Prosecutorial Misconduct; Jury Instruction

**¶51** Carlson argues that the trial court improperly instructed the jury to consider the circumstances of the crime as additional aggravating factors to be weighed against the mitigating circumstances when it gave the following jury instruction:

> In reaching a reasoned, moral judgment about which sentence is justified and appropriate, you must decide how compelling or persuasive the totality of the mitigating factors is when compared against the totality of the aggravating factors and the facts and circumstances of the case. This assessment is not a mathematical one, but instead must be made in light of each juror's individual qualitative evaluation of the facts of the case, the severity of the aggravating factors, and the quality of the mitigating factors found by each juror.

¶52 The defense did not object to this instruction, so we review for fundamental error. *See State v. Gomez*, 211 Ariz. 494, 499 ¶ 20, 123 P.3d 1131, 1136 (2005). Relatedly, Carlson argues that the prosecutor committed misconduct during closing arguments by inviting the jury to consider circumstances of the crime, such as burning the bodies, during the penalty phase. He claims that the trial court abused its discretion by overruling his objections to the prosecutor's arguments. "When a defendant objects to an alleged act of prosecutorial misconduct" and raises the overruling of the objection as error on appeal, we first look to see whether error has occurred; if it has, "we review the issue for harmless error." *State v. Dann*, 220 Ariz. 351, 373 ¶ 125, 207 P.3d 604, 626 (2009).

¶53 Carlson argues that the contested jury instruction and the prosecutor's argument were based on an improper reading of A.R.S. § 13–751(G). *See, e.g.*, *Nordstrom*, 230 Ariz. at 114 ¶ 9, 280 P.3d at 1248 (relying, in part, on A.R.S. § 13–751(G)). Section 13–751(G) provides that "[t]he trier of fact shall consider *as mitigating circumstances* any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense." *Id.* (emphasis added). Under Carlson's interpretation, the statute provides that the trier of fact must consider the circumstances of the offense as mitigating circumstances, but may not consider those circumstances to show that the defendant does not deserve leniency.

¶54 We have previously rejected this argument. *State v. Ovante*, 231 Ariz. 180, 187 ¶¶ 31–32, 291 P.3d 974, 981 (2013). Although Carlson's reading of A.R.S. § 13–751(G) comports with the statute's text, it fails to account for each juror's duty to evaluate all the relevant evidence when determining the defendant's sentence. *See State v. Prince*, 226 Ariz. 516, 526–27 ¶¶ 16–18, 250 P.3d 1145, 1155–56 (2011); *see also* A.R.S. § 13–752(G) (allowing the state to present "any evidence that demonstrates that the defendant should not be shown leniency"). Accordingly, the penalty phase jury instructions were not erroneous.[6]

---

[6] As we have previously noted, asking jurors to "balance," "weigh," or "compare" mitigating factors against aggravating factors "might confuse or mislead jurors." *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468,

**¶55** Carlson also contends that, by commenting on the burning of the victims' bodies, the State impermissibly suggested that jurors could consider that fact as fulfilling the non-alleged cruel, heinous, or depraved aggravating circumstance. *See* A.R.S. § 13–751(F)(6). Although a prosecutor may argue that the defendant does not deserve leniency based on the facts of a case, *State v. Armstrong*, 218 Ariz. 451, 461 ¶ 38, 189 P.3d 378, 388 (2008), "it is improper [for the state] to argue a non-alleged aggravating circumstance," *State v. Nelson*, 229 Ariz. 180, 189 ¶ 40, 273 P.3d 632, 641 (2012). The prosecutor may, however, argue any circumstances that rebut the mitigation evidence proffered by the defense. *State v. Medina*, 232 Ariz. 391, 409 ¶ 79, 306 P.3d 48, 66 (2013). In this case, the State did not argue that different or additional aggravating circumstances applied; indeed, the prosecutor took pains to ensure that the jurors understood that the manner of death did not establish an additional aggravating circumstance. Instead, the prosecutor's comments rebutted the defense's plea for leniency and its characterization of Carlson as a protector of the innocent.

**¶56** The trial court did not abuse its discretion by overruling defense counsel's objections to the prosecutor's closing arguments.

### G. Victim Impact Evidence

**¶57** Carlson argues that the victim impact evidence violated his rights "to due process, a fair trial by jury, and to be free from cruel and unusual punishment."[7] We review constitutional issues de novo. *State v. Moody*, 208 Ariz. 424, 445 ¶ 62, 94 P.3d 1119, 1140 (2004). Because Carlson objected to the victim impact statements at trial, we review for an abuse of discretion. *State v. Rose*, 231 Ariz. 500, 511 ¶ 48, 297 P.3d 906, 917 (2013).

---

473 ¶ 21, 123 P.3d 662, 667 (2005). Instructions should instead focus on whether, in each "juror's individual assessment, the mitigation is of such quality or value that it warrants leniency." *Id.* Terms such as "balance," "outweigh," and "compare" should not be used. *See id.* This does not mean that giving the current version of the jury instruction, as set forth above, constitutes error, but a more precise instruction should be fashioned. *See id.*

[7] Carlson also asserts that the evidence violated A.R.S. § 13–752(R), but he failed to cite any authority or make any arguments to that effect.

**¶58**          During the penalty phase, a victim "may present information about the murdered person and the impact of the murder on the victim and other family members and may submit a victim impact statement in any format to the trier of fact." A.R.S. § 13–752(R). The victim may not, however, "offer any opinion regarding the appropriate sentence to be imposed." Ariz. R. Crim. P. 19.1(d)(3); *see also Prince*, 226 Ariz. at 534 ¶ 65, 250 P.3d at 1163; *State v. Bocharski* (*Bocharski I*), 200 Ariz. 50, 62 ¶ 64, 22 P.3d 43, 55 (2001) ("Sentencing recommendations offered by a deceased's survivors have no relevance in a capital case.").

**¶59**          Becky's daughter read a letter to the jury in which she stated: "[Carlson] is a dangerous man. Who will be safe around him? What place is there in our society for a man who would kill a woman like this?" She also stated, "I don't believe that any of us will ever be safe if he's allowed freedom in his lifetime." She then asked: "What punishment should he face? This is up to you."

**¶60**          The victim impact statement appears to advocate for the death penalty or at least for a sentence of life in prison without the possibility of parole. This Court has emphasized that "prosecutors and trial courts [should] prevent [victim impact evidence] presenters from alluding to or addressing *in any way* the potential sentence." *Rose*, 231 Ariz. at 513 ¶ 58, 297 P.3d at 919 (emphasis added).

**¶61**          The trial court therefore erred in allowing such statements. The error was not ameliorated by having the victim tell the jurors that the sentence was up to them. The error here, however, was brief and in passing. The statement was immediately preceded by the court's instruction that the jurors could not consider the victims' sentencing recommendations, but could consider the victims' loss only to rebut mitigation. *See State v. Bocharski* (*Bocharski II*), 218 Ariz. 476, 488 ¶ 53, 189 P.3d 403, 415 (2008). We have consistently stated our assumption that jurors follow such instructions. *See Perkins v. Komarnyckyj*, 172 Ariz. 115, 119, 834 P.2d 1260, 1264 (1992). Any error in this case was therefore harmless. This is not to say that all such errors are harmless so long as the trial court provides an appropriate instruction. Rather when, as here, the references were brief and indirect, a proper limiting instruction may suffice to ensure the jury will not use the statement improperly. And we again urge prosecutors and judges

to carefully review potential victim impact evidence for compliance with the rules.[8]

### H.        Motion for a Change of Judge

**¶62**        Although he was represented by counsel, Carlson submitted a handwritten motion for a change of judge at the beginning of the sentencing hearing.  He argues on appeal that the trial court "erred in refusing to refer the motion for change of judge to the presiding judge" and that this failure violated his right to a fair and impartial judge.  "The determination of a Rule 10.1 motion lies within the discretion of the trial judge, and we will not interfere absent an affirmative showing of abuse." *State v. Schackart*, 190 Ariz. 238, 257, 947 P.2d 315, 334 (1997).

**¶63**        A defendant who is represented by counsel is not entitled to hybrid representation.  *State v. Cornell*, 179 Ariz. 314, 325, 878 P.2d 1352, 1363 (1994).  That is, a represented defendant may not file motions in addition to those the attorney files. *See id.*  Thus, the court was not required to hear or rule on the motion and did not err by declining to do so.

### I.        Mitigation Verdict Form

**¶64**        Carlson argues that the trial court erred by declining to provide the jury with a mitigation verdict form, which Carlson requested at trial, indicating which mitigating factors the jurors considered and which they found applicable.  He argues that this failure restricted his ability to challenge his death sentence, violating his rights to due process, a full and fair appeal, effective assistance of counsel, and freedom from cruel and unusual punishment.  We review issues involving constitutionality de novo. *Moody*, 208 Ariz. at 445 ¶ 62, 94 P.3d at 1140.

---

[8]        In a case such as this, when the victim reads a letter or speaks from notes, the prosecutor has a duty to review the contents of the proposed presentation to help prevent introduction of statements regarding the defendant's sentence.  If in doubt, the issue should be referred to the judge before the jury is permitted to hear any statement advocating a potential sentence.

**¶65** Carlson concedes that this Court has rejected these arguments on several occasions. *See, e.g.*, *Forde*, 233 Ariz. at 573–74 ¶ 134, 315 P.3d at 1230–31 (stating that "because jurors 'do not have to agree unanimously that a mitigating circumstance has been proven to exist' and '[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty,' A.R.S. § 13–751(C), provision of a special verdict form would have been inappropriate"). We again reject them here.

## J.    Abuse of Discretion Review

**¶66** The jury found three aggravating factors beyond a reasonable doubt: Carlson committed prior serious offenses under A.R.S. § 13–751(F)(2), he was on release from a state department of corrections under § 13–751(F)(7), and he committed multiple homicides under § 13–751(F)(8). The jury also considered mitigation evidence, which included that Carlson had a difficult childhood and suffered several mental-health crises, lacked support systems, did not premeditate his crime, felt remorse, had a protective nature, and did not pose a risk of future dangerousness in prison.

**¶67** This Court reviews death sentences "to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." A.R.S. § 13–756(A); *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2011). We review de novo Carlson's claim that A.R.S. § 13–756(A) violates the Constitution. *State v. Martinez*, 218 Ariz. 421, 434 ¶ 59, 189 P.3d 348, 361 (2008).

**¶68** Section 13–756(A) provides that, for murders that occurred after August 1, 2002, as these did, this Court must "review all death sentences to determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death." Under this standard, we will affirm a decision if it is supported by reasonable evidence in the record. *Morris*, 215 Ariz. at 341 ¶ 77, 160 P.3d at 220. Carlson argues that this standard fails to fulfill the requirement that this Court conduct a "meaningful review" of each death sentence, in violation of the Eighth and Fourteenth Amendments, and *Clemons v. Mississippi*, 494 U.S. 738, 748–49 (1990).

**¶69** This Court has previously rejected similar constitutional challenges to the statutory review standard. *See Martinez*, 218 Ariz. at 434 ¶¶ 59–62, 189 P.3d at 361 (noting that the Supreme Court has "never required de novo review of death sentences"); *see also State v. Boyston*, 231 Ariz. 539, 553 ¶ 71, 298 P.3d 887, 901 (2013); *Rose*, 231 Ariz. at 515 ¶ 71, 297 P.3d at 921. Carlson acknowledges that this issue has been repeatedly raised and rejected, but raises four related arguments: (1) the statute's abuse of discretion standard is not suitable for review of a jury verdict because such verdicts are usually reviewed for sufficiency of the evidence and abuse of discretion is usually used for review of trial court rulings, (2) trial court rulings that are reviewed for abuse of discretion should be reviewed de novo if they involve mixed questions of fact and law, (3) the purpose of reviewing the jury verdict is to determine if the verdict violates the Eighth Amendment—a constitutional question that should be reviewed de novo, and (4) as a factual matter, abuse of discretion review has not proved meaningful because, since § 13–756(A) was enacted by the legislature, this Court has reviewed twenty-nine capital cases and has not reversed the death sentence in any of them.

**¶70** But the "abuse of discretion" label is not relevant to whether A.R.S. § 13–756(A) violates the Constitution. Carlson must show that the standard as applied violates the Constitution or Supreme Court case law by providing review that is not constitutionally "meaningful." Carlson points to nothing to indicate that abuse of discretion review fails to meet that standard. He does not cite any cases that require independent review or de novo review as the sole means to provide meaningful appellate review. *See Clemons*, 494 U.S. at 749 (requiring only "meaningful appellate review"); *see also Parker v. Dugger*, 498 U.S. 308, 321 (1991) (same, and requiring a "review of the individual record in th[e] case").

**¶71** The Eighth Amendment "requires that a sentencer's discretion be channeled and limited to avoid the risk of wholly arbitrary and capricious action." *State v. Hinchey*, 165 Ariz. 432, 436, 799 P.2d 352, 356 (1990) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)). Carlson does not show that the Arizona statute results in "arbitrary and capricious action." Rather, abuse of discretion review still requires the Court to review the entire record and ensure that the aggravating circumstances were correctly found and applied and the imposition of the death penalty was

not improper in light of the mitigating circumstances.

**¶72** Carlson next argues that the jury abused its discretion in imposing the death penalty because the aggravating factors in this case deserved little weight while the mitigation presented at trial was overwhelming.

**¶73** The State alleged and proved, beyond a reasonable doubt, three aggravating factors. Carlson argues that the (F)(2) aggravator, conviction of a prior serious offense, deserves little weight because the serious offense Carlson committed was the same offense for which he was on parole when he committed the murders, and therefore the same conviction is being used to satisfy both the (F)(2) and the (F)(7) aggravators. *See* A.R.S. § 13–751(F). Because "the aggravators serve different public policy rationales," however, the jury was entitled to consider each factor. *See Medina*, 232 Ariz. at 410 ¶ 86, 306 P.3d at 67. Moreover, the (F)(2) aggravator was also supported by Carlson's kidnapping convictions, *see supra* ¶¶ 48–49, which did not support the (F)(7) aggravator.

**¶74** Carlson also argues that the (F)(2) aggravator deserves less weight because the serious crime of kidnapping was committed contemporaneously with the murders. As discussed above, however, "the legislature amended the (F)(2) aggravator in 2003 to explicitly include contemporaneous convictions." *Nordstrom*, 230 Ariz. at 118 ¶ 35, 280 P.3d at 1252. The jurors were therefore entitled to consider the contemporaneous kidnapping convictions in finding the (F)(2) aggravator.

**¶75** Next, Carlson argues that the weight of the (F)(7) aggravator, committing a crime while on release from prison, was "lessened by the fact that the undisputed evidence showed that the Texas prison system is the most brutal and savage in the entire country." But nothing in § 13–751(F)(7) requires the jury to discount the seriousness of this factor based on the circumstances of the defendant's prior incarceration.

**¶76** Finally, Carlson argues that the (F)(8) aggravator, which we have held is entitled to great weight, *State v. Hampton*, 213 Ariz. 167, 184 ¶ 81, 140 P.3d 950, 967 (2006), deserves less weight here because some jurors might have believed that Carlson was not the only participant in the crimes.

The defense presented this argument to the jury, which considered and apparently rejected it when determining whether death sentences were warranted.

¶77 Although Carlson presented considerable mitigation evidence, "we will not reverse the jury's decision so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Morris*, 215 Ariz. at 341 ¶ 81, 160 P.3d at 220. Given the serious aggravation proven in this case, we cannot say that the jury abused its discretion in finding that the mitigation was not sufficiently substantial to call for leniency. *See id.* at 341 ¶ 82, 160 P.3d at 220. The jury therefore did not abuse its discretion when it unanimously concluded that death sentences were warranted.

## K. Consecutive Sentences for Kidnapping

¶78 Carlson received a death sentence for each murder conviction, and twenty-one years' imprisonment for each kidnapping conviction, with each sentence to run consecutively. Because Carlson did not object at trial to the imposition of consecutive sentences, we review his claim that such sentences are illegal for fundamental error. *See Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶79 Carlson argues that the consecutive sentences imposed for the felony-murder charges and the underlying kidnapping charges violate A.R.S. § 13–116, which states that "[a]n act or omission which is made punishable in different ways by different sections of the laws may be punished under both, but in no event may sentences be other than concurrent." He argues that because the kidnapping is the predicate felony for the felony-murder charge and therefore part of the crime, the kidnapping and murder are really part of the "same offense" and cannot be punished by consecutive sentences.

¶80 To determine whether facts constitute a "single act" that would require concurrent sentences under § 13–116, Arizona courts apply the three-part test set forth in *State v. Gordon*, 161 Ariz. 308, 312–13, 778 P.2d 1204, 1208–09 (1989). First, the court considers "the facts of each crime separately, subtracting from the factual transaction the evidence necessary

to convict on the ultimate charge. . . . If the remaining evidence satisfies the elements of the other crime, then consecutive sentences may be permissible under A.R.S. § 13–116." *Id.* at 315, 778 P.2d at 1211. The court then considers "whether, given the entire 'transaction,' it was factually impossible to commit the ultimate crime without also committing the secondary crime. If so, then the likelihood will increase that the defendant committed a single act under A.R.S. § 13–116." *Id.* Finally, the court considers "whether the defendant's conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime. If so, then ordinarily the court should find that the defendant committed multiple acts and should receive consecutive sentences." *Id.*

¶81 Carlson argues that a felony-murder conviction that is based on only one predicate felony will always fail the *Gordon* test. The "ultimate crime" is the more serious crime: felony murder. That crime consists of the fact that someone died during the course of the predicate felony (here, kidnapping). Once these facts are "subtracted," no facts are left to satisfy the elements of the other crime.

¶82 Carlson's argument is built on a faulty premise. The "ultimate crime" for which he was convicted is first-degree murder, regardless of whether the jury convicted on a theory of premeditated or felony murder. *See State v. Miniefield*, 110 Ariz. 599, 603, 522 P.2d 25, 29 (1974) ("[T]he fact that the [predicate felony] supplied the premeditation necessary for first-degree murder does not make it part of the same offense."); *see also State v. Encinas*, 132 Ariz. 493, 496, 647 P.2d 624, 627 (1982) ("In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder."). Thus, Carlson's convictions satisfy the *Gordon* test. After subtracting the murders from the factual transaction, the kidnappings remain. It is possible to commit kidnapping without murdering the victims, or murder without kidnapping the victims. Finally, the kidnappings created a risk of emotional and physical harm to Becky and KR in addition to the harms caused by their ultimate murders. *See Gordon*, 161 Ariz. at 315–16, 778 P.2d at 1211–12 (physically restraining the victim "increased her harm or risk of harm beyond that inherent in the ultimate crime"). The imposition of consecutive sentences therefore did not violate § 13–116.

**¶83**      This result comports with *State v. Girdler*, 138 Ariz. 482, 488–89, 675 P.2d 1301, 1307–08 (1983), which held that sentences for felony murder and the predicate felony for the murder may run consecutively. Carlson argues that we should overrule *Girdler* because our later opinion in *Gordon* prohibits consecutive sentences for "every felony murder case where only one predicate felony exists." As noted above, we reject this interpretation of *Gordon*. Moreover, since *Gordon*, we have continued to uphold consecutive sentences for a felony murder and its predicate offense. *See State v. Runningeagle*, 176 Ariz. 59, 67, 859 P.2d 169, 177 (1993). The trial court therefore did not err by imposing consecutive sentences for Carlson's kidnapping convictions.

**¶84**      Carlson also argues that imposing consecutive sentences for kidnapping and felony murder violates the Double Jeopardy Clause. We disagree. "The Double Jeopardy Clause bars a second prosecution for the same offense after conviction or acquittal and bars multiple punishments for the same offense." *State v. Siddle*, 202 Ariz. 512, 515 ¶ 8, 47 P.3d 1150, 1153 (App. 2002). As set forth above, Carlson did not receive "multiple punishments for the same offense." He was sentenced separately for felony murders and for two counts of kidnapping, which created harm to the victims in addition to the harm ultimately caused by death. "[W]hen statutes describe different offenses, consecutive sentences are permissible without implicating the prohibition against double jeopardy." *State v. (Shawnte) Jones*, 235 Ariz. 501, 504 ¶ 13, 334 P.3d 191, 194 (2014) (quoting *State v. Eagle*, 196 Ariz. 188, 190 ¶ 6, 994 P.2d 395, 397 (2000)) (holding double jeopardy not violated by felony-murder charge and underlying child-abuse charge); *see also Siddle*, 202 Ariz. at 517 ¶¶ 13, 15, 47 P.3d at 1155 (recognizing that "[f]elony murder and the predicate felony are distinct crimes and may be punished separately in a single trial without running afoul of double jeopardy principles"). Thus, Carlson's challenges to the consecutive sentences under both § 13–116 and the Double Jeopardy Clause fail.

## III. CONCLUSION

**¶85**      For the foregoing reasons, we affirm Carlson's convictions

and sentences.[9]

---

[9]    Carlson lists twenty-one additional issues, which he acknowledges have previously been rejected by this Court, to preserve them for future review. We decline to revisit those issues.