NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

SHANI R., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, R.H., J.H., A.H., *Appellees*.

No. 1 CA-JV 22-0051
FILED 12-8-2022

Appeal from the Superior Court in Maricopa County
No.  JD534266
The Honorable Julie Ann Mata, Judge

**AFFIRMED**

COUNSEL

Law Office of Ed Johnson PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Peter B. Swann[1] joined.

---

**P A T O N**, Judge:

¶1 Shani R. ("Mother") appeals the superior court's order adjudicating her three children dependent. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 As relevant here, Mother has three children: twins R.H. and J.H., born in 2005, and A.H., born in 2007. Some years prior to the current dependency, R.H. and J.H. were diagnosed with attention-deficit hyperactivity disorder ("ADHD") and prescribed medication. R.H. was also diagnosed with bipolar and impulse-control disorders, and J.H. with dyslexia.

¶3 Starting in 2019, the Department of Child Safety ("DCS") received reports about frequent altercations between Mother and the children. During one investigation, DCS learned that Mother and the children's stepfather often kicked R.H. out of the home. Although R.H. usually stayed with friends when this occurred, he had also reportedly "spent a day or two sleeping in a park." In January 2020, Mother described R.H. as "out of control" and asked DCS to immediately remove him. Instead, he remained in the home, and DCS provided the family with in-home services, including behavioral health services and medication management.

---

[1] Judge Peter B. Swann was a sitting member of this court when the matter was assigned to this panel of the court. He retired effective November 28, 2022. In accordance with the authority granted by Article 6, Section 3, of the Arizona Constitution and pursuant to A.R.S. § 12-145, the Chief Justice of the Arizona Supreme Court has designated Judge Swann as a judge *pro tempore* in the Court of Appeals for the purpose of participating in the resolution of cases assigned to this panel during his term in office.

¶4            Six months later, however, R.H. got into an altercation with Mother and her new live-in boyfriend.  During this fight, R.H. pointed a loaded gun at his head, threatened to kill himself, and was hospitalized. Because Mother was still unable to handle R.H.'s aggressive behaviors, he moved to a therapeutic group home for several months before returning home.

¶5            In May 2021, DCS learned that A.H. threatened to kill herself with scissors during an argument with Mother.  A.H. was then admitted to a psychiatric hospital for suicidal ideations, where she reported that Mother "hit her in the face several times with a closed fist."  A.H. later recanted this statement, explaining that Mother only attempted to hit her.  When A.H. was discharged a few days later, Mother agreed to continue her outpatient treatment, including individual therapy.  According to A.H., however, Mother refused to give her the phone to call for scheduled counseling. Mother denied this, stating that A.H. simply refused to participate.

¶6            Four months later, Mother called the police after she and the children "got into it" about a television that the twins had taken from her home.  According to Mother, R.H. tried to hit her with a bench, and A.H. hit Mother's car with a chair.  Mother told police she did not want R.H. or A.H. in the home anymore and wanted to press charges against them for the damage to her car.  Police reviewed home video of the incident which showed no one had thrown any chairs at Mother's car.

¶7            DCS received reports that during the altercation, Mother hit R.H. with a metal bar, hit A.H., and told R.H. and A.H. they could not come back home.  R.H. appeared at school the next day wearing pajamas.  Mother later acknowledged that she had prohibited A.H. from letting her brother back in the home, which is consistent with both R.H.'s claim that Mother had kicked him out of the house and his appearance at school the next morning in pajamas.

¶8            Mother denied hitting the children but told the DCS investigator she was struggling with severe anxiety and depression and described the home situation as "the same" — that she was "trying to . . . instill discipline in 'unruly ass kids,' and [w]hen they do not get their way, she gets a visit[] from DCS."  DCS reported Mother asked DCS to take custody of them because she did not know what else to do about their behaviors and was unable to manage them.  DCS further reported that Mother refused in-home services, and stated that she is not the problem. Mother signed a form consenting to the removal of the children by DCS, and DCS placed them in a kinship placement.

¶9　　　　About a week later, A.H. reported that Mother had hit her during the altercation, explaining it was the third or fourth time, though the first time she had hit Mother back. She explained that Mother "always hits me in the face," with either an open hand or closed fist. DCS petitioned the court to adjudicate the children dependent. It then referred Mother for supervised visits and asked her to complete parenting classes in the community. Mother attended about half of the visits before the dependency adjudication and completed a parenting class.

¶10　　　　Meanwhile, the relative notified DCS he could no longer care for the children. At that time, Mother told the case manager she wanted J.H. placed in her home and R.H. and A.H. moved to group homes. The next day, Mother told the case manager she wanted all three children returned to her. DCS moved them to group homes. Although R.H. and J.H. demonstrated aggressive behaviors there, staff reported it was not severe, and the twins excelled in the home's behavior-reward system. A.H. had no behavioral issues and likewise excelled in the behavior-reward system.

¶11　　　　Just before the dependency hearing, Mother began the Nurturing Parenting Program, and the children began behavioral-health services. After a hearing, the superior court adjudicated the children dependent, finding "that [M]other failed to provide for the children's basic needs." It declined to adjudicate the children dependent, however, based on DCS's allegations of Mother's unaddressed mental health or domestic violence. Mother appealed. This Court has jurisdiction under A.R.S. § 8-235(A).

**DISCUSSION**

¶12　　　　Mother first argues that the superior court's single factual finding was insufficient because it failed to specify which of the children's needs she did not meet. The sufficiency of factual findings is a mixed question of law and fact that this Court reviews de novo. *Francine C. v. Dep't of Child Safety*, 249 Ariz. 289, 296, ¶ 14 (App. 2020). The superior court must state in its order the specific "factual basis for the dependency." A.R.S. § 8-844(C)(1)(a)(ii); Ariz. R.P. Juv. Ct. 338(h)(4). Factual findings must be sufficient to allow this Court to "determine exactly which issues were decided and whether the lower court correctly applied the law." *Francine C.*, 249 Ariz. at 295–96, ¶ 13 (citation omitted).

¶13　　　　At a minimum, the superior court must make "at least one factual finding sufficient to support each . . . conclusion[] of law," including all "the ultimate facts . . . necessary to resolve the disputed issues." *Ruben*

*M. v. Ariz. Dep't of Econ. Sec.*, 230 Ariz., 236 240–41, ¶¶ 22, 25 (App. 2012) (citation omitted) (analyzing similar statutory and rule-based requirements for termination hearings). *Compare* A.R.S. § 8-538(A) and Ariz. R.P. Juv. Ct. 353(h)(2)(A) (findings requirements after termination hearings) *with* A.R.S. § 8-844(C)(1)(a)(2) and Ariz. R.P. Juv. Ct. 338(h)(4) (similar requirements after dependency hearings). Insufficient facts are those so lacking in detail that the appellate court must "search the record to uncover ultimate facts the court may have relied upon" or to guess about the process by which the court reached its decision. *Logan B. v. Dep't of Child Safety*, 244 Ariz. at 538–39, ¶¶ 17–19. The level of detail required for proper review varies with the complexity of the legal issues. *Ruben M.*, 230 Ariz. at 241, ¶¶ 25–27. When the grounds for the court's judgment are simple and straightforward, more summary findings are sufficient. *See id.* at 241, ¶ 27.

**¶14** Here, the court's single factual finding that "[M]other failed to provide for the children's basic needs," is sufficient to support the dependency adjudication. The finding identifies the court's basis for the dependency and allows this Court to determine, with the support of the record, whether the superior court correctly applied the law.

**¶15** Mother contends the court needed to specify which of the children's needs she did not meet, but the basic needs a court considers are listed in the dependency statute: "proper and effective parental care and control," A.R.S. § 8-201(15)(a)(i), and "the necessities of life, including adequate food, clothing, shelter or medical care," *id.* § 8-201(15)(a)(ii). *See Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 451–52, ¶ 19 (App. 2007) ("[W]e affirm the trial court's order if the facts at trial support the trial court's findings whether or not each supportive fact is specifically called out by the trial court in its findings.") (citing *State v. Smith*, 123 Ariz. 243, 247 (1979)). The universe of needs is therefore narrow enough to allow for appellate review.

**¶16** Turning to the merits, the primary consideration in any dependency action is the best interests of the child. *See Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005). Accordingly, the superior court is vested with substantial discretion, *Ariz. Dep't of Econ. Sec. v. Superior Ct.*, 178 Ariz. 236, 239 (App. 1994), and we will not disturb its dependency finding unless there is no reasonable evidence in the record to support it. *Willie G.*, 211 Ariz. at 235, ¶ 21. The superior court is "in the best position to weigh the evidence, judge the credibility of the parties, observe the parties, and make appropriate factual findings." *Pima Cty. Dependency Action No. 93511*, 154 Ariz. 543, 546 (App. 1987). This Court therefore views the evidence and reasonable inferences from the evidence in a light most

favorable to sustaining the superior court's order and will not substitute its judgment for that of the superior court. *Maricopa Cty. Juv. Action No. JD-5312*, 178 Ariz. 372, 376 (App. 1994); *see also Pima Cty. Juv. Action No. 118537*, 185 Ariz. 77, 79 (App. 1994) ("It was for [the superior] court, not this court, to assess [witness] credibility.").

¶17        A court must determine whether a child is dependent by a preponderance of the evidence. A.R.S. § 8-844(C)(1). A dependent child is one "[i]n need of proper and effective parental care and control and who has no parent or guardian . . . willing to exercise or capable of exercising such care and control." A.R.S. § 8-201(15)(a)(i). "Control" is "[p]ower or authority to manage, direct, superintend, restrict, regulate, direct, govern, administer, or oversee." *Control*, Black's Law Dictionary (4th ed. 1951). "Care" is "[a]ttention . . .; custody . . .; watchfulness." *Care*, Black's Law Dictionary (4th ed. 1951). The superior court must make its dependency determination "based upon the circumstances existing at the time of the adjudication hearing." *Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 50, ¶ 12 (App. 2016).

¶18        Mother argues that (1) insufficient evidence supports the dependency order, (2) she agreed only to a temporary, voluntary placement which cannot support a dependency under A.R.S. § 8-806(G), Ariz. Rev. Stat., and (3) because she was afraid for her own health and welfare, A.R.S. § 8-201.01(B) prevents a neglect finding.

¶19        There is no doubt that the children sometimes exhibited difficult and threatening behaviors towards Mother. The case manager testified that even after the family received services, however, Mother was unable to address conflict without escalating herself and the children "to the point of physical altercations between them." The record shows a pattern of serious altercations in which some of the children threatened their own lives. Further, Mother was unable to ensure the children consistently receive their medication and behavioral-health services. Despite this hostile dynamic, Mother regularly denied responsibility for the issues in the home and refused to keep the children in the home.

¶20        In the current dependency, Mother signed a consent form giving DCS temporary custody, which stated she was "unable or unwilling to perform essential parental responsibilities," and at least one child was "actively endangering [him]self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care." By Mother's own admissions at that time, she was unable to exert appropriate

control over the children. She also refused to keep the children in the home, and by doing so, was unwilling to meet their basic needs.

¶21        Reasonable evidence also supports a finding that Mother remained unable to properly supervise the children at the time of the dependency hearing. At trial, Mother testified that she was ready to have the children home. When asked what had changed, however, Mother stated simply that DCS had taken too long to implement services. Nevertheless, she acknowledged that progress in services would make the children's behaviors more manageable for her. And the case manager opined that neither Mother nor the children had made sufficient progress yet. Further, as late as two months before the dependency hearing, Mother had asked DCS to place some of the children in group homes, indicating she was not yet ready to properly supervise them.

¶22        Mother next argues she is insulated from the court's dependency finding by A.R.S. § 8-806(G), which states a "voluntary placement does not constitute . . . dependency. . . ." Mother claimed for the first time at trial that she had consented only to a ninety-day voluntary placement. But there is no voluntary placement agreement in the record, *see* A.R.S. § 8-806(D), and the consent form Mother signed granting DCS temporary custody contains no indication that the parties intended the out-of-home placement to last only ninety days, *see* A.R.S. § 8-821. Mother's argument is therefore unavailing.

¶23        Because the superior court's factual finding is sufficient to support the dependency adjudication under A.R.S. § 8-201(15)(a)(i)–(ii), we do not address Mother's neglect argument. *See State v. Carlson*, 237 Ariz. 387, ¶ 7 (2015) ("We will affirm the trial court's ruling if the result was legally correct for any reason." (citation omitted)).

## CONCLUSION

¶24        We affirm.



AMY M. WOOD • Clerk of the Court
FILED:     AA

7